**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

RECEIVED
OCT 01 2013
CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

United States of America, *ex rel., and*
Robert A. Dicken, *Relator,*

        The Government,

    vs.

Northwest Eye Center, P.A.
Christopher J. Borgen and
Eric M. Tjelle,

        Defendants.

---

CASE NO.: _____

COMPLAINT *IN CAMERA*
FOR MEDICARE FRAUD
UNDER THE CIVIL FALSE
CLAIMS ACT,
31 U.S.C. §§ 3729 *et seq.*

DEMAND FOR JURY TRIAL

FILED UNDER SEAL

DO NOT PLACE IN PRESS BOX

DO NOT ENTER ON PACER

## GENERAL ALLEGATIONS

1.    Relator brings this action on behalf of the United States of America against Defendants for civil penalties and treble damages arising from Defendants' false statements and/or claims in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* The violations arise out of false and fraudulent claims related to Medicare.

2.    As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relator has

1

SCANNED
OCT 0 1 2013
U.S. DISTRICT COURT ST. PAUL

provided to the Attorney General of the United States and to the United States Attorney for the District of Minnesota a statement of all material evidence and information related to the complaint. This disclosure statement is supported by material evidence known to Relator at his filing establishing the existence of Defendants' false and fraudulent claims to Medicare estimated to amount to more than a million dollars. Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

### JURISDICTION AND VENUE

3.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.  This action arises under the provisions of 31 U.S.C. §§ 3729 *et seq.* to recover damages and civil penalties on behalf of the United States of America arising out of false claims presented by Defendants to the the Federal Medicare program.

4.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.* and complained of herein took place in this district. Venue is also proper pursuant to 28 U.S.C. § 1391(b) and (c) because, at all times material and relevant, Defendants transact and transacted business in this district.

5.      Section 3729(a) of the False Claims Act provides that "any action under section 3730 may be brought in any judicial district in which any Defendant may be found to reside, or transact business, or in any district in which any proscribed act has occurred."  Defendants have transacted business in Minnesota, fraud was concealed within the State of Minnesota, and

Defendants' clinic, Northwest Eye Center, P.A., is located in the State of Minnesota.

6.     Under the Act, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days, and not be served on Defendants until the Court so orders. The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and information.  Simultaneously with this Complaint, Relator has filed an application to have the complaint and all subsequent pleadings in this matter filed under seal.

## PARTIES TO THE ACTION

7.     The United States, through the HHS/CMS, is the government party in interest in this action. The headquarter offices for HHS are located at 200 Independence Avenue, S.W., Washington, D.C. 20201, and the main offices for CMS are located at 7500 Security Boulevard, Baltimore, MD 21244.

8.     Relator Dicken, hereafter referred to as "Relator," is a citizen of the United States and resident of the State of Minnesota, from 1949 to present.  Relator is a board certified ophthalmologist and currently practices as an ophthalmologist. Beginning on or about July 2002, Relator began practicing as a separate entity in the same physical location as Defendants at Northwest Eye Center, P.A. (hereinafter referred to as Northwest), and his employment at that location carried through until April 30, 2011.

9.     Relator is an original source of this information to the United States.  He has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing an action under the False Claims Act that is based on the information.

10.     Relator brings this action on behalf of the United States based on his direct,

3

independent, and personal knowledge, as well as on information and belief. Relator is an original

source of this information to the United States. To his knowledge, the information contained

herein concerning Defendant Doctors' alleged False Claims Act violations has not been publicly

disclosed.  He has direct and independent knowledge of the information on which the allegations

are based and has voluntarily provided the information to the government before filing said

action under the False Claims Act.

11.     Defendants Christopher J. Borgen, O.D. ("Borgen") and Eric M. Tjelle, O.D.

("Tjelle") are licensed optometrists who provide eye care services as Northwest, a healthcare

organization doing business in Minnesota. Northwest is specifically located at 901 Hanson

Drive, Thief River Falls, MN 56701. Defendants Borgen and Tjelle (collectively "Defendant

Doctors") provide eye care services to, among other patients, persons who are beneficiaries

under the Medicare Program.

12.     Defendant Northwest is an optometric clinic organization that provides eye care

services to the public.  The defendant operates a program that employs the Defendant Doctors

and pays them with funds obtained in whole or in part from the Medicare program.

### THE FALSE CLAIMS ACT

13.     **§ 3729. False claims**
1)      Liability for certain acts.
a)      In general. Subject to paragraph (2), any person who--
i)      knowingly presents, or causes to be presented, a false or
fraudulent claim for payment or approval;
ii)     knowingly makes, uses, or causes to be made or used, a
false record or statement material to a false or fraudulent
claim;
iii)    conspires to commit a violation of subparagraph (A), (B),
(D), (E), (F), or (G);
iv)     has possession, custody, or control of property or money
used, or to be used, by the Government and knowingly

delivers, or causes to be delivered, less than all of that money or property;

v)    is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

vi)    knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

vii)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $ 5,000 and not more than $ 10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

b)    Reduced damages. If the court finds that--

i)    the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

ii)    such person fully cooperated with any Government investigation of such violation; and

iii)    at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation, the court may assess not

less than 2 times the amount of damages which the Government sustains because of the act of that person.

c)  Costs of civil actions. A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

2)  Definitions. For purposes of this section--

a)  the terms "knowing" and "knowingly"--

i)  mean that a person, with respect to information--

(1)  has actual knowledge of the information;

(2)  acts in deliberate ignorance of the truth or falsity of the information; or

(3)  acts in reckless disregard of the truth or falsity of the information; and

ii)  require no proof of specific intent to defraud;

b)  the term "claim"--

i)  means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(1)  is presented to an officer, employee, or agent of the United States; or

(2)  is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(a)  provides or has provided any portion of the money or property requested or demanded; or

(b)  will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

ii)  does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

c)  the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-

6

grantee, or licensor-licensee relationship, from a fee-based or
similar relationship, from statute or regulation, or from the
retention of any overpayment; and

d)     the term "material" means having a natural tendency to influence,
or be capable of influencing, the payment or receipt of money or
property.

3)     Exemption from disclosure. Any information furnished pursuant to
subsection (a)(2) shall be exempt from disclosure under section 552 of
title 5.

4)     Exclusion. This section does not apply to claims, records, or statements
made under the Internal Revenue Code of 1986 [26 USCS §§ 1 et seq.].

5)     [Redesignated]

### THE MEDICARE PROGRAM

14.     In 1965, Congress enacted Title XVIII of the Social Security Act, thereby

establishing the Medicare Program, to pay for the cost of certain services and care.  The United

States, through the Department of Health and Human Services ("HHS"), administers the Hospital

Insurance Program for the Aged and Disabled established by Part A ("Medicare Part A

Program") and the Supplementary Medical Insurance Program established by Part B ("Medicare

Part B Program"), Title XVIII, of the Social Security Act under 42 U.S.C. §§ 1395 *et seq.* The

Medicare Part A and Medicare Part B programs are federally financed health insurance systems

for persons who are aged 65 and over, as well as for those who are disabled. HHS has delegated

the administration of the Medicare Program to the Health Care Financing Administration

("HCFA"), a component of HHS. Another component of HHS, the Office of Inspector General

("OIG") is responsible for investigating Medicare fraud and abuse, as well as issuing regulations

and instructions that implement the Medicare fraud and abuse authorities.

15.     The Medicare Part A program covers all inpatient services, including those

provided by ophthalmologists and optometrists, provided to eligible persons known as Medicare

beneficiaries. As additional background, the Part A program covers certain home health services

7

provided to Medicare beneficiaries who do not have Part B coverage. The Medicare Part B Program provides coverage for a wide range of outpatient services, for physician and diagnostic services, for home health services for Part B eligible persons and for durable medical equipment.

16.     The Department of Health and Human Services is an agency of the United States and is responsible for the funding, administration, and supervision of the Medicare Program. Only providers who are "participants" may submit assigned claims for payment. In order to become a participant, providers and others must agree to certain conditions of participation, including, *inter alia,* the following program requirements:

A.     Not to make false statements or misrepresentations of material facts concerning requests for reimbursement, 42 U.S.C. §§ 1320a-7b(a)(1)(2), 1320a-7, 1320a-7a; 42 C.F.R. § 1001.101(a)(1);

B.     To bill Medicare only for reasonable and necessary services, 42 U.S.C. § 1395y(a)(1)(A).

C.     To provide economical medical services, and only when medically necessary, 42 U.S.C. § 1320c-5(a)(1);

D.     To assure that such services are not substantially in excess of the needs of such patients, 42 U.S.C. § 1320a-7(b)(6)(B);

E.     To certify that the service claimed is a medical necessity. 42 U.S.C. § 1395n(a)(2)(B).

## SPECIFIC FACTUAL ALLEGATIONS

17.     Relator Robert A. Dicken is a medical doctor in Minnesota.

18.     Relator is a Board Certified Ophthalmologist with 26 years of practice experience. He practiced 9 years as a Board Certified Family Practitioner before becoming an eye surgeon.

8

For over 20 years, he was a solo practitioner.  Because of that experience, he has in-depth knowledge of the procedural (CPT) and diagnostic (ICD-9-CM) codes required when billing Medicare and of the regulations and guidelines applied to Medicare billings.  In this Complaint, he is reporting violations of 31 U.S.C. §§ 3729 *et seq.*, False and Fraudulent Claims, by Northwest, Christopher J. Borgen, O.D. and Eric M. Tjelle, O.D. (collectively "Defendant Doctors").  The Defendant Doctors submit Medicare claims through Northwest. Relator saw these optometrists abuse the doctor patient relationships and file false Medicare claims.

19.     From January 1, 1988 until on or about August 2010, Relator practiced as a separate corporate entity in the same physical location as the optometric group in the clinic. From January 1, 1988 until on or about July 2002, the optometrist in the practice was Harold Freeman, O.D.  Later the Defendant Doctors took over his practice.  Once the Defendant Doctors came into the group as optometrists, they began to act inappropriately by improperly billing Medicare.  The Defendant Doctors told patients that they could do everything Relator could, despite the fact they were not licensed to practice medicine.  On or about July 2002, the Defendant Doctors became the optometrists in Relator's shared clinic.  From the beginning, it was clear that their practice and billing patterns were not in accordance with proper medical standards.  Until on or about August 2010, Relator continued to practice in the same physical location as the Defendant Doctors.

20.     Relator's medical practice timetable is as follows:

    1971 to 1974 – Medical School, University of Minnesota

    1974 to 1975 – Family Practice Internship, University of Minnesota

    1975 to 1978 – Air Force Medical Corps, General Medical Office Hahn AFB,

        Germany

1978 to 1984 – Family Practitioner, Falls Clinic, Thief River Falls, Minnesota

1984 to 1987 – Ophthalmology Residency, University of Minnesota

July 1, 1987 to December 31, 1987 – Ophthalmology practice, Dakota Clinic,

      Thief River Falls, Minnesota

January 1, 1988 – Started independent, solo practice, Dicken, P.A.  Associated

      with optometrist Dr. Hal Freeman (separate business entities).

January 1988 to 2010 – Relator shared patients with Borgen & Tjelle.

July 2001 – Dr. Borgen joined Dr. Freeman.

July 2002 – Dr. Tjelle joined Dr. Borgen.  Dr. Freeman left optometric practice.

April 1, 2009 – Relator joined Meritcare, a multi-specialty group practice based in

      Fargo, North Dakota.  Relator was still sharing some patients with

      Northwest.

January 1, 2010 – Sanford Health acquired Meritcare and Relator became an

      employee of Sanford Health.  Northwest was referring patients to Sanford

      Health and vice versa.

April 30, 2011 – Sanford Health terminated Relator's employment "without

      cause" after Relator reported suspected violations of law by the Defendant

      Doctors.

21.     Relator Dicken was an employee of Sanford Health from January 2010 to April

30, 2011.  He shared patients with Northwest from 2001 to 2010.  Relator's duties included

treating patients, going over their medical files and working with the Defendant Doctors.

22.     During the course of his employment, he learned that the Defendant Doctors were

making false claims to Medicare.

23.     At all times relevant to this Complaint, Defendants have treated many patients and sought reimbursements from Medicare. Defendants have engaged in a pattern and practice of fraud by knowingly submitting false claims to obtain wrongful reimbursement from Medicare.

24.     The Medicare patients who the Defendant Doctors see are from the "Greatest Generation." Relator has been told by these patients, "You're the doctor, do what you think is right." Because of the patients' high trust level, they do not question the Defendant Doctors' conduct and/or billing.  The Defendant Doctors are so focused on generating income that neither the welfare of the patient nor being honest with the government is of primary concern.

25.     Relator was able to identify the false claims billed to Medicare by the Defendant Doctors because he is a board certified ophthalmologist with over twenty-five years of ophthalmology practice experience, which has provided him with extensive knowledge of procedural and diagnostic codes required when billing Medicare and the regulations and guidelines for such billing.

26.     While practicing ophthalmology at the physical location of Northwest,  the Relator made numerous discoveries of false claims by the Defendant Doctors in the normal course of his practice by examining patients who he shared with the Defendant Doctors, as well as by personally inspecting numerous pieces of false claims knowingly submitted by the Defendant Doctors to bill Medicare.

27.     Relator has identified and procured material evidence for a number of different methods by which Defendants have fraudulently obtained wrongful reimbursement from Medicare.  The Relator has observed the Defendant Doctors file false claims for Medicare from July 2002.  He has personal knowledge that false information was submitted to Medicare by the Defendant Doctors from July 2002.

11

28.     The Defendant Doctors routinely, knowingly, intentionally, and with scienter used insufficient documentation for the level of coding used to bill Medicare.

29.     The Defendant Doctors routinely, knowingly, intentionally, and with scienter billed Medicare for procedures that provided no value to the patient, or for tests that were not indicated by the patient's diagnosis, frequently by abusing CPT Codes 92250 (fundus photos), 92135 (HRT), 92082/92083 (visual fields), 92225/92226 (extended ophthalmoscopy), and 92020 (gonioscopy).

30.     The Defendant Doctors routinely, knowingly, intentionally, and with scienter billed Medicare for services not rendered, frequently by abusing CPT Codes 92225 and 92226 (extended ophthalmoscopy).

31.     The Defendant Doctors routinely, knowingly, intentionally, and with scienter make false diagnoses to justify tests and procedures billed to Medicare that do not reflect the patient's actual condition, frequently by abusing ICD-9 Code 362.83 (macular edema).

32.     Records for the majority of patients seen by the Defendant Doctors contain one or more of the above violations, collectively estimated to amount to more than a million dollars of false and fraudulent claims paid to the Defendant Doctors.

33.     There may well be additional methods by which costs have been falsely and fraudulently allocated by the Defendant Doctors to obtain wrongful reimbursement from Medicare.

34.     The Defendant Doctors routinely, knowingly, intentionally, and with scienter do not follow all Medicare requirements for filing claims.

35.     Relator has first-hand knowledge of the violations by the Defendant Doctors that he is reporting.  The Relator regularly examined shared patients and became aware of the

12

Defendant Doctors' billing for procedures not performed.  Billing for excessive and unnecessary procedures, which brought no benefit to their patients and falsifying and changing diagnoses to justify procedures.  Relator heard Northwest's business manager tell the Defendant Doctors they cannot bill a procedure with the diagnosis given and that they needed to change the diagnosis, they did.  Many shared patients with Relator clearly did not have the diagnoses made by the Defendant Doctors (primarily Retinal Edema, ICD-9-CM code 362.83).  Many of these same patients were billed CPT Code 92135 (HRT).  A HRT would show retinal edema if the test was done and the edema existed.  The tests that were run showed the invalidity of the billing.

36.     The majority of Medicare patients seen by Northwest were billed CPT codes 92225 or 92226 (Extended Ophthalmoscopy).  To legally bill this code, a detailed retinal drawing with interpretation is required.  Relator has never seen the required drawing completed on these patients.  These codes are also "reserved for serious retinal pathology."  In 2008, extended ophthalmoscopy was billed in 15% of office visits by ophthalmologists.  The Defendant Doctors far exceeded the expected use of these codes.  Ophthalmologists would only use the code for extended opthalmoscopy sparingly and according to a professional article around 15% of the time.  Optometrists would be expected to use it even less; not withstanding that fact, the Defendant Doctors used the code much more than 15%.  "For Optometrists, the utilization rate is lower" (Ophthalmology Management, 2010).

37.     Relator observed the patterns of false claims and abuse by the Defendant Doctors escalate each year.

38.     Relator observed Northwest staff keep detailed recall lists, including which tests and procedures could be performed on the same day.  Relator observed that they had a list that

allowed them to recall and run unnecessary tests to maximize billing at the expense of the patient and Medicare.

39.     In 2009, Relator joined the multi-specialty group, Meritcare, in Thief River Falls. On or about August 2010, the Meritcare group moved him to a separate location in their clinic. The move was made after Relator reported to the clinic leadership suspected violations of law related to the Defendant Doctors' billing practices.  Clinic leadership did not properly address his concerns.  Dr. Borgen's uncle, a radiologist, was one of the leaders of the Meritcare clinic and later of Sanford Health.  He made it clear he did not want Relator to pursue his concerns related to suspected violations of law by the Defendant Doctors.  He threatened Relator with termination from the clinic for reporting suspected violations of law by them.  After Relator reported suspected violations of Medicare, Sanford Health retaliated by terminating Relator's job.

40.     At all times relevant to this lawsuit, Sanford Health was an employer within the meaning of the law and Relator was an employee within the meaning of the law.  Northwest and Sanford Health wrongly retaliated against him for whistleblowing.  After the Relator whistleblew, the Defendants were unprofessional and showed a spiteful, malevolent, and retaliatory animus toward the Relator that was not commensurate with the situation.  Relator whistleblew on April 16, 2010, in a letter to the Office of the Inspector General, and October 22, 2010, to Meritcare, Sanford Health and to Dr. R.W. Heinrichs.  The representative of Meritcare and Sanford Health told Relator he was being terminated "because of the situation with Drs. Borgen and Tjelle."

41.     Relator, in good faith, reported suspected violations of law by Defendants Northwest submitting false claims to Medicare and related fraudulent behavior by the Defendant Doctors.  He made these good faith reports in April 2010 to October 2010.

14

42.     Defendants Northwest and Sanford Health retaliated against Relator for whistleblowing by discriminating against, disciplining, threatening, and penalizing Relator on his terms, conditions and privileges of employment.  After Relator whistleblew, Northwest and Sanford Health retaliated by negative, damaging, and unfair treatment against him.  Defendants Northwest and Sanford Health retaliated against him by negatively impacting his job and terminating his employment.

43.     Relator reported to the Meritcare Clinic supervisor in approximately 2008, that the Defendant Doctors were submitting false and excessive claims to Medicare.  Subsequently, he made other reports, as well.  Meritcare and Sanford Health did not take corrective action, but concealed from the government the false claims by Defendant.

44.     Northwest and Sanford Health retaliated against Relator, because of Relator's aforementioned whistleblowing reports.  Sanford Health moved Relator's office unnecessarily, cut down on referrals to him and terminated his employment.

45.     Northwest and Sanford Health's wrongful retaliation for Relator's aforementioned whistleblowing caused the Relator ongoing damage.

46.     Relator's whistleblowing timetable is as follows:

August 28, 2008 – Meeting with Dr. R. Heinrichs, Meritcare Managing Physician Partner (MPP).  Discussed Relator joining Meritcare.  First discussed Relator's concerns about the Defendant Doctors' practice patterns.

October 24, 2008 – Meeting with TRF Meritcare administrator, Ms. Nyflot. Discussed Relator joining Meritcare.  Again discussed Relator's concerns about the Defendant Doctors.

April 20, 2009 – Relator became an employee of Meritcare.

June 18, 2009 – Meeting with Drs. Heinrichs, Langland, and Snyder (Dr. Borgen's uncle).

September 8, 2009 – Meeting in Fargo, North Dakota, to discuss impending acquisition of Meritcare by Sanford Health. Relator discussed his concerns about the Defendant Doctors with Meritcare/Sanford Health leadership.

October 23, 2009 – Meeting with TRF Meritcare Administrator, Ms. Demarais. Relator expressed his concerns about the Defendant Doctors.

January 1, 2010 – Sanford Health acquired Meritcare. Relator became a Sanford Health employee.

April 16, 2010 – Relator presented his concerns about the Defendant Doctors to Medicare.

June 15, 2010 – Meeting with Ms. Demarais. Relator expressed more strongly his concerns about the Defendant Doctors.

June 16, 2010 – Relator was informed that Trust Solutions, LLC had received his complaint from Medicare.

July 20, 2010 – Meeting with Drs. Heinrichs and Patel (Sanford Health MPPs) and Ms. Demarais. Relator received a first notice termination without cause.

July 29, 2010 – Relator received from Dr. Patel a second notice termination without cause.

August 2010 – Relator's office was moved from its location with Northwest to

another location in Sanford Health's TRF Clinic.

October 22, 2010 – Meeting with Dr. Heinrichs.  Relator requested an official

compliance review by Sanford Health of the Defendant Doctors' billing

practices.

October 25, 2010 – Relator was summoned to a meeting with Drs. Heinrichs,

Patel, and Wall.  Meeting was on a Sunday, and held at Dr. Heinrich's

house.  Relator was told that he had no chance of continued employment

with Sanford Health.  They specifically mentioned that the Defendant

Doctors' revenues far exceeded Relator's and that they knew he had

"turned them in to Medicare."

November 2, 2010 – Meeting with Dan Olson, Sanford Health North

Administrator.  Relator strongly expressed his concerns about the

Defendant Doctors' behavior.  Mr. Olson effectively "blew him off."

November 15, 2010 – Relator received a letter from Dr. Pitts congratulating him

on his two-year reappointment to Sanford Health's medical staff.

March 14, 2011 – Relator received an e-mail from Dr. Patel with a new

"termination with cause" from Sanford Health.  Relator was unable to

print a copy of the e-mail.  When he later requested a copy of the e-mail

from Ms. Demarais, one was not provided.

March 28, 2011 – Relator sent a response to Dr. Patel "strongly disputing" his

termination with cause.

April 30, 2011 – Relator's employment with Sanford Health was terminated.

NOTE: Because of Relator's termination by Sanford Health, he lost his home to

foreclosure in 2012.

47.    The Defendant Doctors submit claims to Medicare under Northwest.  There are

several reasons the Defendant Doctors have been able to continue their behavior unobstructed.

Optometrists are able to "fly under the Medicare radar."  Claims are processed without knowing

the number of providers in the clinic.  Further, processing of Medicare claims is performed by

non-medical personnel who match diagnostic codes to procedural codes.  A review of the

amount of Medicare claims paid to Northwest, would show the magnitude of the false claims and

abuse Relator is reporting.

48.    Upon information and belief, the Defendant Doctors knew of the proper policies,

procedures, and criteria for obtaining reimbursements under Medicare. They knowingly violated

such policies, procedures, and criteria to fraudulently obtain greater reimbursement payments

than they were entitled to receive.

49.    As set forth above, the Defendant Doctors knowingly and intentionally caused to

be submitted untruthful, incorrect, or incomplete requests for payment to Medicare, in violation

of 31 U.S.C. § 3729.

50.    As a result of the Defendant Doctors' unlawful conduct, the United States

reimbursed Defendant for greater amounts than Defendants were otherwise entitled to receive.

51.    Before Relator made discoveries of false claims by the Defendant Doctors while

practicing in the same physical location as Northwest, Relator and the United States did not

know, and could not reasonably have known, the facts material to the causes of action pled in

this Complaint.

## APPLICABLE MEDICARE VIOLATIONS BY DEFENDANTS

52.     The claims by the Defendant Doctors were false and fraudulent in that they

violated §§ 2100–2102.2 of the Provider Reimbursement Manual. These three sections violated

by the Defendant Doctors are listed below.

First, § 2100 of the Provider Reimbursement Manual requires that:

All payments to providers of services must be based on the reasonable cost of
services under Title XVIII of the Act and related to the care of beneficiaries.
Reasonable cost includes all necessary and proper costs incurred in rendering the
services subject to principles relating to specific items of revenue and cost.

Second, § 2102.1 of the Provider Reimbursement Manual requires that:

[A]ctual costs be paid to the extent they are reasonable . . . [meaning they] do not
exceed what a prudent and cost-conscious buyer pays for a given item or service.
If costs are determined to exceed the level that such buyers incur, in the absence
of clear evidence that the higher costs were unavoidable, the excess costs are not
reimbursable under the program.

Third, § 2102.02 of the Provider Reimbursement Manual requires that costs related to
patient care only:

[I]nclude all necessary and proper costs, which are appropriate and helpful in
developing and maintaining the operation of patient care facilities and activities.
Necessary and proper costs related to patient care are usually costs which are
common and accepted occurrences in the field of the provider's activity.  They
include personnel costs, administrative costs, costs of employee pension plans,
normal standby costs, and others.  Allowability of costs is subject to the
regulations prescribing the treatment of specific items under the Medicare
program.

By way of the wrongful acts described in paragraphs 17 through 52, the Defendant

Doctors violated the above three sections of the Provider Reimbursement Manual.

### FIRST CAUSE OF ACTION

### FALSE CLAIMS ACT VIOLATIONS

### (31 U.S.C. §§ 3729(a)(1)(A) and (B))

19

53.     Relator repeats and repleads and incorporates by reference each and every one of the allegations contained in paragraphs 1 through 52 as though fully set forth herein.

54.     Between in or about July 2002 and in or about the filing of this Complaint, the Defendants (a) knowingly presented to the United States, or caused to be presented to the United States, false and fraudulent claims for payment or approval; and (b) knowingly made, used, or caused to be made or used, false records or statements material to false and fraudulent claims to the United States, all in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (B).

55.     The foregoing acts by the Defendant Doctors were wrongful in the following respects:

A.      In violation of 31 U.S.C. § 3729(a)(1)(A), the Defendant Doctors knowingly, and with intent to defraud the United States, presented false and fraudulent claims for payment or approval.

B.      In violation of 31 U.S.C. § 3729(a)(1)(B), the Defendant Doctors knowingly, and with intent to defraud the United States, made and used false records material to false and fraudulent claims.

C.      The claims were false and fraudulent because they violated § 2100 of the Provider Reimbursement Manual, which requires that all payments to providers of services must be based on the reasonable cost of services under Title XVIII of the Act and related to the care of beneficiaries. Reasonable cost includes all necessary and proper costs incurred in rendering the services subject to principles relating to specific items of revenue and cost.

D.     The claims were false and fraudulent because they violated § 2102.1 of the Provider Reimbursement Manual, which requires actual costs be paid to the extent they are reasonable, meaning they do not exceed what a prudent and cost-conscious buyer pays for a given item or service. If costs are determined to exceed the level that such buyers incur, in the absence of clear evidence that the higher costs were unavoidable, the excess costs are not reimbursable under the program.

E.     The claims were false and fraudulent because they violated § 2102.2 of the Provider Reimbursement Manual, which requires that costs related to patient care include all necessary and proper costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. Necessary and proper costs related to patient care are usually costs which are common and accepted occurrences in the field of the provider's activity. They include personnel costs, administrative costs, costs of employee pension plans, normal standby costs, and others. Allow ability of costs is subject to the regulations prescribing the treatment of specific items under the Medicare program.

56.     The Defendant Doctors set about a course to obtain from the government money that was not due to them by filing false Medicare claims. The Defendant Doctors took money from the government under false pretenses from July 2002 onward.

57.     The Defendant Doctors routinely, knowingly, intentionally, and with scienter represented to the government that they had provided services that should be reimbursed under Medicare when that was not true, as follows:

A.    The Defendant Doctors routinely, knowingly, intentionally, and with scienter used insufficient documentation for the level of coding used to bill Medicare.

B.    The Defendant Doctors routinely intentionally, knowingly, and with scienter bill Medicare for procedures that provide no value to the patient, or for tests that are not indicated by the patient's diagnosis, frequently by abusing CPT Codes 92250 (fundus photos), 92135 (HRT), 92082/92083 (visual fields), 92225/92226 (extended ophthalmoscopy), and 92020 (gonioscopy).

C.    The Defendant Doctors routinely, knowingly, intentionally, and with scienter routinely bill Medicare for services not rendered, frequently by abusing CPT Codes 92225 and 92226 (extended ophthalmoscopy).

D.    The Defendant Doctors routinely, knowingly, intentionally, and with scienter routinely make false diagnoses to justify tests and procedures billed to Medicare that do not reflect the patient's actual condition, frequently by abusing ICD-9 Code 362.83 (macular edema).

E.    Records for the majority of patients seen by the Defendant Doctors contain one or more of the above violations, collectively estimated to amount to more than a million dollars of false and fraudulent claims paid to the Defendant Doctors.

F.    Upon information and belief, the Defendant Doctors knew of the proper policies, procedures, and criteria for obtaining reimbursements under Medicare. They knowingly violated such policies, procedures, and criteria

22

to fraudulently obtain greater reimbursement payments than they were

entitled to receive.

G.    The Defendant Doctors have routinely, knowingly, intentionally, and with

scienter not followed proper standards for making Medicare claims.

58.    Relator has identified and procured material evidence for a number of different

methods by which the Defendant Doctors have fraudulently obtained wrongful reimbursement

from Medicare.  The Relator has observed the Defendant Doctors submit false claims for

Medicare from July 2002.  He has personal knowledge that the forgoing false information was

submitted to Medicare on claims by Defendants from July 2002.

59.    As set forth above, the Defendant Doctors knowingly and intentionally submitted

or caused to be submitted untruthful, incorrect, or incomplete requests for payment to Medicare,

in violation of 31 U.S.C. § 3729.

60.    As a result of Defendants' unlawful conduct, the United States reimbursed

Defendant for greater amounts than they were entitled to receive.

61.    The United States did not know, and could not reasonably have known, before

Relator made discoveries of false claims by the Defendant Doctors while practicing in the same

physical location as Northwest, of the facts material to the causes of action pled in this

Complaint.

62.    The Relator observed the Defendant Doctors file the false claims set forth herein.

The foregoing false claims by the Defendant Doctors were made of a past and present fact.  They

were susceptible of knowledge.

63.    The foregoing intentional and false claims with scienter by the Defendant Doctors

in 2002, 2003, 2004, and afterward were material and susceptible to knowledge.

23

64.    At the time the Defendant Doctors made the foregoing false claims from July 2002 onward, they understood that they were misleading.  The government was fraudulently misled by the Defendant Doctors into believing that payments were due to them.

65.    By their forgoing unauthorized acts and false claims, the Defendant Doctors damaged the government.

66.    The Defendant Doctors intended that the government be induced to act or would be justified in so acting in making the forgoing false claims to it.

67.    Based upon the foregoing false claims by the Defendant Doctors, the government paid money to Defendants that was not due to them.

68.    The government was ignorant of the falsity of the Defendant Doctors' false claims, omissions and concealments.

69.    The government believed the Defendant Doctors' claims to be true, and reasonably relied on their truth and accuracy.

70.    In reliance on the Defendant Doctors' false claims, the government paid money to the Defendant Doctors from July 2002 onward.

71.    The damage experienced by the government was related to the forgoing false claims of the Defendant Doctors.  The government suffered damage by making payments to the Defendants.

72.    Had the government known of the true facts, it would not have taken the above such actions.

73.    The government has not discovered the false claims after the original acts of fraud by the Defendant Doctors.

74.    As a direct and proximate result of the Defendant Doctors' false claims, the government has been damaged.

75.    By virtue of this scheme, the Defendant Doctors defrauded the United States and the Medicare Program of a substantial amount, estimated by Relator to be more than a million dollars, to be determined at trial.

### SECOND CAUSE OF ACTION

### CONSPIRACY TO SUBMIT FALSE CLAIMS

76.    Relator realleges and incorporates the allegations of paragraphs as if fully set forth herein.

77.    The Defendant Doctors combined, conspired, and agreed together to defraud the United States by knowingly submitting false claims to the United States and to its grantees for the purpose of getting the false or fraudulent claims paid or allowed and committed the other overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C. § 3729(a)(3), causing damage to the United States.

### PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as follows:

1.    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

2.    That civil penalties of $11,000.00 be imposed for each and every false and fraudulent claim that Defendants presented to the United States and/or its grantees;

3.    That pre- and post-judgment interest be awarded, along with reasonable attorneys'

fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

4.      That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Complaint;

5.      That the Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act; and

6.      That the Court award punitive damages to be paid by the Defendant Doctors jointly and severally; and

7.      That this Court award such other and further relief as it deems proper. Relator requests jury trial.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Date: 9/30/2013

Neff Law Firm, P.A.

Fred L. Neff, Atty. Reg. #0077355
Attorney for Relator
One Corporate Plaza, Ste. 390
7400 Metro Boulevard
Edina, MN 55439
Telephone: (952) 831-6555
Facsimile: (952) 831-2711