# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

Case No.: Civil No. 13-SC-2691 (JNE/FLN)

United States of America, *ex rel., and*
Robert A. Dicken, *Relator,*

     The Government,

     vs.

Northwest Eye Center, P.A.;
Sanford Health Network,
a South Dakota non-profit
corporation doing business in
Minnesota, Christopher J. Borgen
and Eric M. Tjelle,

     Defendants.

---

**FIRST AMENDED COMPLAINT *IN CAMERA* FOR MEDICARE
FRAUD UNDER THE CIVIL FALSE CLAIMS ACT, 31 U.S.C.§§ 3729
*et seq.*; CONSPIRACY TO COMMIT FRAUD UNDER THE CIVIL
FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*; RETALIATION
UNDER THE CIVIL FALSE CLAIMS ACT 31 U.S.C. § 3730(h);
RETALIATION FOR WHISTLEBLOWING UNDER MINN. STAT.
§ 181.932, BREACH OF CONTRACT, INTERFERENCE WITH
CONTRACT AND INTERFERENCE WITH PROSPECTIVE
ECONOMIC ADVANTAGE.**

**DEMAND FOR JURY TRIAL**

1

## GENERAL ALLEGATIONS

1.      Relator brings this action on behalf of the United States of America against Defendants for civil penalties and treble damages arising from Defendants' false statements and/or claims in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* The violations arise out of false and fraudulent claims related to Medicare.

2.      As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relator has provided to the Attorney General of the United States and to the United States Attorney for the District of Minnesota a statement of all material evidence and information related to the complaint. This disclosure statement is supported by material evidence known to Relator at his filing establishing the existence of Defendants' false and fraudulent claims to Medicare estimated to amount to more than a million dollars. Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

3.      Relator also brings a separate claim for conspiracy to violate the False Claims Act, specifically 31 U.S.C. § 3729(a)(1)(A) and (B), pursuant to (31 U.S.C. §3729(a)(1)(C)).

2

4.     Relator also brings a separate claim for retaliation pursuant to 31 U.S.C. §3730(h).

5.     Relator also brings a separate claim for retaliation pursuant to Minn. Stat. § 181.932.

6.     Relator also brings a separate claim for breach of contract.

7.     Relator also brings a separate claim for interference with contract.

8.     Relator brings a separate claim for interference with prospective economic advantage.

### JURISDICTION AND VENUE

9.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* and 3730(h).   Additionally, this action arises out of the Minnesota Whistleblower Act, Minn. Stat, § 181.932.   This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).   This Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.   This action arises under the provisions of 31 U.S.C. §§ 3729 *et seq.* to recover damages and civil penalties on behalf of the United States of America arising out of false claims presented by Defendants to the Federal Medicare program.

10.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.* and complained of herein took place in this district. Venue is also proper pursuant to 28 U.S.C. § 1391(b) and

3

(c) because, at all times material and relevant, Defendants transact and transacted business in this district.

11.     Section 3729(a) of the False Claims Act provides that "any action under section 3730 may be brought in any judicial district in which any Defendant may be found to reside, or transact business, or in any district in which any proscribed act has occurred."  Defendants have transacted business in Minnesota, fraud was concealed within the State of Minnesota, and Defendants' clinic, Northwest Eye Center, P.A., is located in the State of Minnesota.

12.     Under the Act, this Complaint is to be filed in camera and remain under seal for a period of at least sixty (60) days, and not be served on Defendants until the Court so orders. The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and information.  Simultaneously with this Complaint, Relator has filed an application to have the complaint and all subsequent pleadings in this matter filed under seal.

## PARTIES TO THE ACTION

13.     The United States, through the HHS/CMS, is the government party in interest in this action. The headquarter offices for HHS are located at 200 Independence Avenue, S.W., Washington, D.C. 20201, and the main offices for CMS are located at 7500 Security Boulevard, Baltimore, MD 21244.

14.     Relator Dicken, hereafter referred to as "Relator," is a citizen of the United States and resident of the State of Minnesota, from 1949 to present.  Relator is a board certified ophthalmologist and currently practices as an ophthalmologist. Beginning on or about July 2002, Relator began practicing as a separate entity in the same physical location as Defendants at Northwest Eye Center, P.A. (hereinafter referred to as Northwest), and his employment at that location carried through until April 30, 2011.

15.     Relator is an original source of this information to the United States. He has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing an action under the False Claims Act that is based on the information.

16.     Relator brings this action on behalf of the United States based on his direct, independent, and personal knowledge, as well as on information and belief. Relator is an original source of this information to the United States. To his knowledge, the information contained herein concerning Defendant Doctors' alleged False Claims Act violations has not been publicly disclosed.  He has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing said action under the False Claims Act.

5

17.    Defendants Christopher J. Borgen, O.D. ("Borgen") and Eric M. Tjelle, O.D. ("Tjelle") are licensed optometrists who provide eye care services as Northwest, a healthcare organization doing business in Minnesota. Northwest is specifically located at 901 Hanson Drive, Thief River Falls, MN 56701. Defendants Borgen and Tjelle (collectively "Defendant Doctors") provide eye care services to, among other patients, persons who are beneficiaries under the Medicare Program.

18.    Defendant Northwest is an optometric clinic organization that provides eye care services to the public.  The defendant operates a program that employs the Defendant Doctors and pays them with funds obtained in whole or in part from the Medicare program.

19.    Defendant Sanford Health Network (hereinafter "Sanford Health) is a South Dakota non-profit corporation doing business in the state of Minnesota.  Its headquarters and registered address is 1305 West 18th Street, Sioux Falls, South Dakota, with a principle place of business at 1300 Anne Street N.W., Bemidji, Minnesota and a registered office address in Minnesota at 1600 North Kniss, Luverne, Minnesota.  Sanford Health operates several medical facilities in northern Minnesota, including the Thief River Falls ("TRF") Clinic.  On or about January 1, 2010, Sanford Health's acquisition of MeritCare Medical Group (hereinafter "MeritCare"), a North Dakota non-profit corporation became effective.

6

## THE FALSE CLAIMS ACT

20.    § 3729. False claims

    (a)    Liability for certain acts.

        (1)    In general. Subject to paragraph (2), any person who--

            (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

            (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

            (C)    conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

            (D)    has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

            (E)    is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

            (F)    knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

            (G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to

the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $ 5,000 and not more than $ 10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(2)    Reduced damages. If the court finds that--

(A)    the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

(B)    such person fully cooperated with any Government investigation of such violation; and

(C)    at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation, the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.

(3)    Costs of civil actions. A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b)    Definitions. For purposes of this section--

(1)    the terms "knowing" and "knowingly"--

(A)    mean that a person, with respect to information--

(i)    has actual knowledge of the information;

(ii)    acts in deliberate ignorance of the truth or falsity of the information; or

(iii)    acts in reckless disregard of the truth or falsity of the information; and

(B)    require no proof of specific intent to defraud;

(2)    the term "claim"--

(A)    means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i)    is presented to an officer, employee, or agent of the United States; or

(ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)    provides or has provided any portion of the money or

property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

(c) Exemption from disclosure. Any information furnished pursuant to subsection (a) (2) shall be exempt from disclosure under section 552 of title 5.

(d) Exclusion. This section does not apply to claims, records, or statements made under the Internal Revenue Code of 1986 [26 USCS §§ 1 *et seq.*].

21. § 3730(h). Relief from retaliatory actions.

(h) Relief From Retaliatory Actions.—

(1)    In general.— Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2)    Relief.— Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

(3)    Limitation on bringing civil action.— A civil action under this subsection may not be brought more than 3 years after the date when the retaliation occurred.

### THE MINNESOTA WHISTLEBLOWER ACT

22.    Minnesota Statute § 181.932 Disclosure of information by employees.

Subdivision 1. Prohibited action.   An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(1)    the employee, or a person acting on behalf of an employee, in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule

11

adopted pursuant to law to an employer or to any governmental body or law enforcement official;

(2)     the employee is requested by a public body or office to participate in an investigation, hearing, inquiry;

(3)     the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason;

(4)     the employee, in good faith, reports a situation in which the quality of health care services provided by a health care facility, organization, or health care provider violates a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm;

(5)     a public employee communicates the findings of a scientific or technical study that the employee, in good faith, believes to be truthful and accurate, including reports to a governmental body or law enforcement official; or

(6)     an employee in the classified service of state government communicates information that the employee, in good faith, believes to be truthful and accurate, and that relates to state services, including the financing of state services, to:

(i)     a legislator or the legislative auditor; or

(ii)    a constitutional officer.

The disclosures protected pursuant to this section do not authorize the disclosure of data otherwise protected by law.

### THE MEDICARE PROGRAM

23.    In 1965, Congress enacted Title XVIII of the Social Security Act,

thereby establishing the Medicare Program, to pay for the cost of certain services and care. The United States, through the Department of Health and Human Services ("HHS"), administers the Hospital Insurance Program for the Aged and Disabled established by Part A ("Medicare Part A Program") and the Supplementary Medical Insurance Program established by Part B ("Medicare Part B Program"), Title XVIII, of the Social Security Act under 42 U.S.C. §§ 1395 *et seq.* The Medicare Part A and Medicare Part B programs are federally financed health insurance systems for persons who are aged 65 and over, as well as for those who are disabled. HHS has delegated the administration of the Medicare Program to the Health Care Financing Administration ("HCFA"), a component of HHS. Another component of HHS, the Office of Inspector General ("OIG") is responsible for investigating Medicare fraud and abuse, as well as issuing regulations and instructions that implement the Medicare fraud and abuse authorities.

24. The Medicare Part A program covers all inpatient services, including those provided by ophthalmologists and optometrists, provided to eligible persons known as Medicare beneficiaries. As additional background, the Part A program covers certain home health services provided to Medicare beneficiaries who do not have Part B coverage. The Medicare Part B Program provides coverage for a wide range of outpatient services, for physician and diagnostic services, for home health

services for Part B eligible persons and for durable medical equipment.

25.    The Department of Health and Human Services is an agency of the United States and is responsible for the funding, administration, and supervision of the Medicare Program.    Only providers who are "participants" may submit assigned claims for payment.    In order to become a participant, providers and others must agree to certain conditions of participation, including, *inter alia,* the following program requirements:

A.    Not to make false statements or misrepresentations of material facts concerning requests for reimbursement, 42 U.S.C. §§ 1320a-7b(a)(1)(2), 1320a-7, 1320a-7a; 42 C.F.R. § 1001.101(a)(1);

B.    To bill Medicare only for reasonable and necessary services, 42 U.S.C. § 1395y(a)(1)(A).

C.    To provide economical medical services, and only when medically necessary, 42 U.S.C. § 1320c-5(a)(1);

D.    To assure that such services are not substantially in excess of the needs of such patients, 42 U.S.C. § 1320a-7(b)(6)(B);

E.    To certify that the service claimed is a medical necessity. 42 U.S.C. § 1395n(a)(2)(B).

### SPECIFIC FACTUAL ALLEGATIONS

26.     Relator Robert A. Dicken is a medical doctor in Minnesota.

27.     Relator is a Board Certified Ophthalmologist with 26 years of practice experience.  He practiced 9 years as a Board Certified Family Practitioner before becoming an eye surgeon.  For over 20 years, he was a solo practitioner.  Because of that experience, he has in-depth knowledge of the procedural (CPT) and diagnostic (ICD-9-CM) codes required when billing Medicare and of the regulations and guidelines applied to Medicare billings.  In this Complaint, he is reporting violations of 31 U.S.C. §§ 3729 *et seq.*, False and Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A) and (B)), as well as Conspiracy to Submit False and Fraudulent Claims (31 U.S.C. § 372(a)(1)(C)) by Northwest, Christopher J. Borgen, O.D. and Eric M. Tjelle, O.D. (collectively "Defendant Doctors").  The Defendant Doctors submit Medicare claims through Northwest. Relator saw these optometrists abuse the doctor patient relationships and file false Medicare claims. Relator also alleges that his employer MeritCare, and subsequently Sanford Health after its acquisition of MeritCare, retaliated against him for whistleblowing in violation of 31 U.S.C. § 3730(h).  Relator also alleges that his employer MeritCare and subsequently Sanford Health after its acquisition of MeritCare retaliated against him for whistleblowing in violation of Minn. Stat. § 181.932.  In addition, Relator alleges Breach of Contract against Sanford Health and Interference with Contract and Interference with Prospective Economic Advantage by Northwest,

Dr. Borgen and Dr. Tjelle.

28.    The Relator was born and raised in the Thief River Falls area and practiced medicine in the area for an extended period of time.  From 1978 through 1984 he practiced as a family medical practitioner, handling the general medical needs of the patients.  He went to the University of Minnesota for three years from 1984 to 1987 to complete his ophthalmology residency.  The Relator returned to Thief River Falls and opened an ophthalmology practice in July 1987.  The Relator developed an extensive network of family, friends, patients and their families and friends who referred their family and friends to him.

29.    From January 1, 1988 until on or about August 2010, Relator practiced at the Northwest Eye Center clinic in Thief River Falls, Minnesota. From January 1, 1988 until on or about July 2002, the optometrist in the practice was Harold Freeman, O.D.  Later the Defendant Doctors took over his practice.  On or about July 2002, the Defendant Doctors became the optometrists in Relator's shared clinic.  Relator continued to practice in the offices of the Northwest Eye Center clinic with the Defendant Doctors until on or about August 2010.  Relator's practice included treating patients, going over their medical files, operating surgically on patients, and working with the defendant Doctors as well as other doctors.  It became clear to the Relator that the Defendant Doctor's practice and billing patterns were not in accordance with proper medical standards.

16

30.   Relator's medical practice timetable is as follows:

1971 to 1974—Medical School, University of Minnesota

1974 to 1975—Family Practice Internship, University of Minnesota

1975 to 1978—Air Force Medical Corps, General Medical Officer, Hahn AFB, Germany

1978 to 1984—Family Medical Practitioner, Falls Clinic, Thief River Falls, Minnesota

1984 to 1987—Ophthalmology Residency, University of Minnesota

July 1, 1987 to December 31, 1987—Ophthalmology practice, Dakota Clinic, Thief River Falls, Minnesota

January 1, 1988—Started independent, solo practice, Dicken, P.A. Associated with optometrist Dr. Hal Freeman (separate business entities).  Relator shared patients with Dr. Freeman.

January 1988 to 2010—Relator shared patients with Dr. Freeman and subsequently the Defendant Doctors practicing as Northwest after Dr. Freeman retired and Dr. Tjelle joined Dr. Borgen in the practice.

July 2001—Dr. Borgen joined Dr. Freeman.  Their practice was known as Freeman and Associates.

July 2002—Dr. Tjelle joined Dr. Borgen.  Dr. Freeman left optometric

practice and the practice name changed from Freeman and Associates to Northwest Eye Center, P.A.

April 1, 2009—Relator joined MeritCare, a multi-specialty group practice based in Fargo, North Dakota. Relator was still sharing some patients with Northwest. Relator's wife who had been working for him part-time as his office administrator also became an employee of MeritCare at the same time continuing to function as Relator's office administrator, but was now employed as such by MeritCare.

January 1, 2010—Sanford Health acquired MeritCare and Relator became an employee of Sanford Health Thief River Falls. Relator's wife also became an employee of Sanford Health Thief Rivers Falls, continuing as Relator's office administrator, but now as an employee of Sanford Health Thief River Falls. Northwest was referring patients to Sanford Health and vice versa.

August 2010—Sanford Health Thief River Falls unnecessarily moved Relator's office from the Northwest location to a location in the Thief River Falls clinic. At the same time as his office was moved, Sanford Health Thief River Falls pretextually

terminated Relator's wife, who was employed by Sanford Health Thief River Falls as his office administrator.

April 30, 2011—Sanford Health pretextually terminated Relator's employment "with cause" after Relator reported suspected violations of law by the Defendant Doctors.

31.     On or about January 26, 2008, Relator entered into an Employment Agreement ("Agreement") with MeritCare Medical Group, a North Dakota non-profit corporation, a copy of which is attached hereto as Exhibit C and incorporated herein by reference.

32.     Section 1 of the Agreement, a copy of which is attached hereto as Exhibit C and incorporated herein by reference, governing the term and duration of the Agreement states as follows:

> MeritCare employs Physician as a member of its staff, and Physician hereby accepts such employment, until terminated by either party in the manner provided in Section 11.

33.     Section 3 of the Agreement, a copy of which is attached hereto as Exhibit C and incorporated herein by reference, governing the office, supplies and support staff to be provided by MeritCare to Relator states as follows:

> MeritCare agrees that it shall provide Physician with the necessary office space and equipment, supplies and support staff generally provided to other physicians employed by MeritCare in the same specialty and practice location.

34.     Section 9 of the Agreement a copy of which is attached hereto as

Exhibit C and incorporated herein by reference, provides for professional negligence coverage and requires MeritCare to provide professional negligence insurance to Relator for any "…professional negligence claims for compensatory damages asserted against Physician which arise out of professional services provided by Physician within Physician's scope of employment by MeritCare."

35.     Section 10 of the Agreement, a copy of which is attached hereto as Exhibit C and incorporated herein by reference, provides that Relator will be "…entitled to health insurance, life insurance, long term disability insurance, and dental insurance benefits as may be purchased from time to time by MeritCare for professional employees working in Physician's profession."

36.     Section 11 of the Agreement, a copy of which is attached hereto as Exhibit C and incorporated herein by reference, governs the termination of the Agreement and states in pertinent part:

> This Agreement may be terminated by either the Physician or MeritCare, with or without cause, at any time during the term of this Agreement effective ninety (90) days after written notice of termination is received by the other party.  Notice may be served upon either party by certified mail, return receipt requested, or by personal service.  If mailed, notice shall be deemed served three (3) days after the date the notice is postmarked. Personal service may be accomplished in the same manner as permitted under the Minnesota Rules of Civil procedure with respect to the service of a summons in a civil action. In addition, Physician's employment may be terminated by MeritCare immediately for "just cause." "Just Cause" shall include one or more of the following:
>
> > a.     If Physician materially violates, breaches or fails to fulfill any of the covenants, terms, or condition of this Agreement and such

20

breach or failure remains uncorrected after (15) days of written notice from MeritCare;

b.  If Physician engaged in any unethical conduct or medical misconduct as defined by State and National Medical Associations and such breach or failure remains uncorrected after (15) days of written notice from MeritCare; and such breach or failure remains uncorrected after (15) days of written notice from MeritCare;

c.  If Physician is suspended or excluded from participation in the Medicare Program;

d.  If MeritCare is unable to obtain malpractice insurance on behalf of the Physician, or if the cost of obtaining such insurance unreasonably exceeds the cost of obtaining such insurance for other physician employees working within the same specialty;

e.  If Physician's professional practice presents a direct threat to the safety of patients, including situations in which Physician's abuse of alcohol or drugs poses a direct threat to patient safety;

f.  If Physician fails to maintain the standard of competence deemed necessary by MeritCare and such breach or failure remains uncorrected after (15) days of written notice from MeritCare;

g.  If Physician engages in any pattern or course of conduct which adversely affects Physician's ability to provide services to MeritCare and such breach or failure remains uncorrected after (15) days of written notice from MeritCare;

h.  If Physician is deemed to have engaged in a serious violation of MeritCare policy regarding patient or employee rights after investigation, or repeatedly violates or continues to violate, after notice, any of MeritCare's polices or directives and such breach or failure remains uncorrected after (15) days of written notice from MeritCare;

i.  If a Physician is absent from work beyond the period authorized by applicable MeritCare policies;

21

      j.      If Physician commits fraudulent or dishonest acts which involve the practice of medicine;

      k.      If Physician engages in any felonious act, or misdemeanor involving moral turpitude (as defined by state or federal law) in connection with Physician's employment;

      l.      If Physician is convicted of, pleads guilty or nolo contendere to any felony, or misdemeanor involving fraudulent conduct or moral turpitude (as defined by applicable state or federal law; or

      m.      If Physician fails to maintain any license or certification required to provide services under this Agreement.

37.     Relator Dicken was an employee of defendant Sanford Health Thief River Falls from January 1, 2010 to April 30, 2011.  He shared patients with Northwest from 2001 to 2010.  Initially, Relator shared patients with Dr. Freeman and then with Drs. Freeman and Borgen (Freeman and Associates).  Relator continued to share patients with Dr. Borgen and Dr. Tjelle after Dr. Freeman retired and Dr. Tjelle joined the practice; the practice then became known as Northwest Eye Center, P.A.  Relator's duties included treating patients, going over their medical files and working with the Defendant Doctors.

38.     During the course of his employment, he learned that the Defendant Doctors were making false claims to Medicare.

39.     At all times relevant to this Complaint, Defendants have treated many patients and sought reimbursements from Medicare. Defendants have engaged in a pattern and practice of fraud by knowingly submitting false claims to obtain

wrongful reimbursement from Medicare.

40.     The Medicare patients who the Defendant Doctors see are from the "Greatest Generation."  Relator has been told by these patients, "You're the doctor, do what you think is right."  Because of the patients' high trust level, they do not question the Defendant Doctors' conduct and/or billing.  The Defendant Doctors are so focused on generating income that neither the welfare of the patient nor being honest with the government is of primary concern.

41.     Relator was able to identify the false claims billed to Medicare by the Defendant Doctors because he is a board certified ophthalmologist with over twenty-five years of ophthalmology practice experience, which has provided him with extensive knowledge of procedural and diagnostic codes required when billing Medicare and the regulations and guidelines for such billing.

42.     While practicing ophthalmology at the physical location of Northwest, the Relator made numerous discoveries of false claims by the Defendant Doctors in the normal course of his practice by examining patients who he shared with the Defendant Doctors, as well as by personally inspecting numerous pieces of false claims knowingly submitted by the Defendant Doctors to bill Medicare.

43.     Relator has identified and procured material evidence for a number of different methods by which Defendants have fraudulently obtained wrongful reimbursement from Medicare.  The Relator has observed the Defendant Doctors

file false claims for Medicare from July 2002. He has personal knowledge that false information was submitted to Medicare by the Defendant Doctors from July 2002.

44.    The Defendant Doctors routinely, knowingly, intentionally, and with scienter used insufficient documentation for the level of coding used to bill Medicare.

45.    The Defendant Doctors routinely, knowingly, intentionally, and with scienter billed Medicare for procedures that provided no value to the patient, or for tests that were not indicated by the patient's diagnosis, frequently by abusing CPT Codes 92250 (fundus photos), 92135 (HRT), 92082/92083 (visual fields), 92225/92226 (extended ophthalmoscopy), and 92020 (gonioscopy).

46.    The Defendant Doctors routinely, knowingly, intentionally, and with scienter billed Medicare for services not rendered, frequently by abusing CPT Codes 92225 and 92226 (extended ophthalmoscopy).

47.    The Defendant Doctors routinely, knowingly, intentionally, and with scienter make false diagnoses to justify tests and procedures billed to Medicare that do not reflect the patient's actual condition, frequently by abusing ICD-9 Code 362.83 (macular edema).

48.    Records for many of the patients seen by the Defendant Doctors contain one or more of the above violations, collectively estimated to amount to

more than a million dollars of false and fraudulent claims paid to the Defendant Doctors.

49.    There may well be additional methods by which costs have been falsely and fraudulently allocated by the Defendant Doctors to obtain wrongful reimbursement from Medicare.

50.    The Defendant Doctors routinely, knowingly, intentionally, and with scienter do not follow all Medicare requirements for filing claims.

51.    Relator has first-hand knowledge of the violations by the Defendant Doctors that he is reporting.  The Relator regularly examined shared patients and became aware of the Defendant Doctors' billing for procedures not performed. Billing for excessive and unnecessary procedures, which brought no benefit to their patients and falsifying and changing diagnoses to justify procedures.  Relator heard Northwest's business manager tell the Defendant Doctors they cannot bill a procedure with the diagnosis given and that they needed to change the diagnosis, they did.  Many shared patients with Relator clearly did not have the diagnoses made by the Defendant Doctors (primarily Retinal Edema, ICD-9-CM code 362.83).  Many of these same patients were billed CPT Code 92135 (HRT).  A HRT would show retinal edema if the test was done and the edema existed.  The tests that were run showed the invalidity of the billing.

52.    The majority of Medicare patients seen by Northwest were billed CPT

codes 92225 or 92226 (Extended Ophthalmoscopy). To legally bill this code, a detailed retinal drawing with interpretation is required. Relator has never seen the required drawing completed on these patients. These codes are also "reserved for serious retinal pathology." In 2008, extended ophthalmoscopy was billed in 15% of office visits by ophthalmologists. The Defendant Doctors far exceeded the expected use of these codes. Ophthalmologists would only use the code for extended ophthalmoscopy sparingly and according to a professional article around 15% of the time. Optometrists would be expected to use it even less; not withstanding that fact, the Defendant Doctors used the code much more than 15%. "For Optometrists, the utilization rate is lower" (Ophthalmology Management, 2010).

53.     Relator observed the patterns of false claims and abuse by the Defendant Doctors escalate each year. Relator observed Northwest staff keep detailed recall lists, including which tests and procedures could be performed on the same day. Relator observed that they had a list that allowed them to recall and run unnecessary tests to maximize billing at the expense of the patient and Medicare. Defendant Doctors engaged in a type of fraudulent churning by getting patients to come in for office visits and then performing unnecessary tests on the patients.

54.     In 2009, Relator joined the multi-specialty group, MeritCare, in Thief

River Falls ("TRF"). On or about August 2010, Sanford Health Thief River Falls moved him to a separate location in their clinic. At the same time, Sanford Health Thief River Falls pretextually terminated Relator's wife from her position as Relator's office administrator. Both the move and the pretextual termination of his wife's employment was made after Relator reported to the clinic leadership suspected violations of law related to the Defendant Doctors' billing practices. Clinic leadership did not properly address his concerns. Dr. Snyder, a radiologist and Dr. Borgen's uncle, was one of the leaders of the MeritCare clinic and later of Sanford Health Thief River Falls. He made it clear he did not want Relator to pursue his concerns related to suspected violations of law by the Defendant Doctors. He threatened Relator with termination from the clinic for reporting suspected violations of law by the Defendant Doctors. After Relator reported suspected violations of Medicare law, Sanford Health Thief River Falls retaliated against Relator and ultimately wrongfully and pretextually terminated Relator's job.

55.     At all times relevant to this lawsuit, Sanford Health was an employer within the meaning of the law and Relator was an employee of Sanford Health within the meaning of the law. Northwest and Sanford Health wrongly retaliated against him for whistleblowing. After the Relator whistleblew, the Defendants were unprofessional and showed a spiteful, malevolent, and retaliatory animus

27

toward the Relator that was not commensurate with the situation. Relator whistleblew on April 16, 2010, in a letter to the Office of the Inspector General, and October 22, 2010, to MeritCare/Sanford Health and to Dr. R.W. Heinrichs. The representative of MeritCare and Sanford Health told Relator he was being terminated "because of the situation with Drs. Borgen and Tjelle."

56.    Relator, in good faith, reported suspected violations of law by Defendants Northwest submitting false claims to Medicare and related fraudulent behavior by the Defendant Doctors. He made these good faith reports in 2009, April 2010 to October 2010 and on April 12, 2011. Within a short period of time after Relator's reports of suspected violations of law Defendants retaliated against him.

57.    Defendant Doctors, Defendant Northwest and Defendant Sanford Health retaliated against the Relator after his reports of suspected violations of law. Defendant Doctors began an orchestrated and escalating campaign to decrease patient referrals to Relator, "steal" Relator's existing patients and divert new and existing patients from Relator.

58.    Defendant Northwest, likewise greatly curtailed patient referrals to Relator.

59.    In retaliation for whistleblowing reports or suspected violations of law Relator made between April 16, 2010 and October 22, 2010, Defendant Sanford

Health in Thief River Falls, threatened Relator's employment, unnecessarily moved his office, Sanford Health told him he could not expect to remain employed by Sanford Health in Thief River Falls, told him that the Defendant Doctors' revenues were greater than his, even though the Defendant Doctors' revenues were dependent on fraudulent billing practices. Further, Sanford Health told Relator that they knew he was the one that had reported them to Medicare and ultimately retaliated against him by pretextually terminating Relator's employment "for cause."

60.    Defendants Northwest and Sanford Health retaliated against Relator for whistleblowing by discriminating against, disciplining, threatening, and penalizing Relator on his terms, conditions and privileges of employment. After Relator whistleblew, Northwest and Sanford Health retaliated by negative, damaging, and unfair treatment against him. Defendants Northwest and Sanford Health retaliated against him by negatively impacting his job and pretextually terminating his employment.

61.    Relator reported to the MeritCare Clinic supervisor in approximately 2008, that the Defendant Doctors were submitting claims to Medicare that would not pass compliance requirements. Subsequently, he made other reports, as well. MeritCare and Sanford Health did not take corrective action, but concealed from the government the false claims by Defendant Northwest and the Defendant

29

Doctors.

62.    Northwest, the Defendant Doctors and Sanford Health retaliated against Relator, because of Relator's aforementioned whistleblowing reports. Northwest and the Defendant Doctors retaliated by orchestrating a scheme to decrease the number of patients referred to Relator, "stealing" Relator's existing patients, and diverting prospective patients from Relator to themselves.   This scheme escalated as Relator continued to report the Defendant Doctors' suspected violations of law.  Sanford Health moved Relator's office unnecessarily, threatened his continued employment, punished him for declining revenues due to the Defendant Doctors' decrease in referrals to and the diverting of patients from Relator, and ultimately wrongfully and pretextually terminated his employment.

63.    The reason stated by Sanford Health for Relator's termination as set forth in the Sanford Health Termination Form, which is attached hereto as Exhibit B and incorporated herein by reference, states:

> Dr. Dicken is been [sic] terminated because he has failed to maintain good relation [sic] with local optometrist( [sic] referrals have completely dried up) and he has not be [sic] able grow [sic] the practice.  The eye department is on a down ward [sic] spiral and will need a complete redo.

64.    Relator disputed the notice of termination he received from Sanford Health as set forth in his response to Sanford Health, a copy of which is attached hereto as Exhibit C and incorporated herein by reference, which states in pertinent part:

I strongly dispute the termination for cause received from you dated 14 March 2011. Referrals "completely dried up" after I challenged the patient care, billing practices and ethics of the optometrists in question    and because of the total lack of support from Sanford Clinic Thief River Falls.

65.     Despite Relator's March 28, 2011 report, and the subsequent verbal report made to Nancy Demarais, administrator, and Chris Harff, the hospital CEO, on April 12, 2011. Within a short period of time from Relator's April 12, 2011 whistleblowing report, Sanford Health pretextually terminated Relator's employment on April 30, 2011.

66.     Sanford Health's termination of Relator's employment was not due to any issues related to his competency as a doctor or his ability to perform the duties and responsibilities of a medical provider. The Sanford Health Final Competency Assessment, a copy of which is attached hereto as Exhibit D and incorporated herein by reference, shows Dr. Dicken fully competent in all areas except "Leadership" in which he was rated "Needs Improvement." This "assessment" of Relator's leadership skills relates directly to his supposed failure to maintain good relations with the local optometrists, which were the subjects in the *qui tam*. "Lack of leadership" is a euphemism for refusal to participate in helping others defraud the government and do a disservice to patients. See Exhibit D, which is attached hereto and incorporated herein by reference. The Defendant's assessment of Relator's leadership was untrue and used as a pretext to terminate his employment in retaliation for his whistleblowing. Sanford Health used a pretextual reason for

wrongfully terminating Relator's employment. In fact, the reason given for the Relator's termination "for cause" was not the listed in the employment agreement as "just cause" for immediate dismissal without notice.

67.     Northwest and Sanford Health's wrongful retaliation for Relator's aforementioned whistleblowing caused the Relator ongoing damage.

68.     Relator's whistleblowing timetable is as follows:

Relator brings up the billing practices/procedures with Defendant Doctors.  Defendant Doctors begin scheme to reduce numbers of patients seen by Relator by cutting down on patient referrals.

August 28, 2008—Meeting with Dr. R. Heinrichs, MeritCare Managing Physician Partner (MPP).  Discussed Relator joining MeritCare.   First discussed Relator's concerns about the Defendant Doctors' practice patterns.

October 24, 2008—Meeting with TRF MeritCare administrator, Ms. Nyflot.  Discussed Relator joining MeritCare.  Again discussed Relator's concerns about the Defendant Doctors.  Defendant Doctors continue to cut down on referrals to Relator

April 1, 2009—Relator became an employee of MeritCare.  Relator's wife also became an employee of MeritCare, continuing her functions as the Relator's office administrator.  Thereafter,

Defendant Doctors stepped up activities designed to decrease referrals to Relator Defendant Doctors. Defendant Doctors "stole" Relator's existing patients by taking over their non-surgical care. Appointments are set up by Defendant Doctors' staff and patients wanting to set up appointments with Relator are diverted to the Defendant Doctors.

June 18, 2009—Meeting with Drs. Heinrichs, Langland, and Snyder (Dr. Borgen's uncle). Defendant Doctors continue interfering with Relator's ability to generate revenue by continuing to cut down referrals. Dr. Snyder becomes particularly nasty toward Relator making it clear that Relator is not to pursue his reports of the Defendant Doctors' suspected violations of law and threatening his continued employment. Relator's wife is told not to answer the phones at the clinic under any circumstances.

September 8, 2009—Meeting in Fargo, North Dakota, to discuss impending acquisition of MeritCare by Sanford Health. Relator discussed his concerns about the Defendant Doctors with MeritCare/Sanford Health leadership.

October 23, 2009—Meeting with TRF MeritCare Administrator, Ms. Demarais. Relator expressed his concerns about the Defendant

Doctors. Relator provides more detailed information about Defendant Doctors' fraudulent billing practices. Defendant Doctors still decreasing patient referrals. Relator is also receiving fewer referrals from Defendant Northwest.

January 1, 2010—Sanford Health acquired MeritCare. Relator became a Sanford Health Thief River Falls employee. Relator's wife also becomes a Sanford Health Thief River Falls employee, continuing her function as Relator's office administrator. Referrals from Defendant Doctors and Northwest continue to decline.

April 16, 2010—Relator presented his concerns about the Defendant Doctors to Medicare.

June 15, 2010—Meeting with Ms. Demarais. Relator expressed more strongly his concerns about the Defendant Doctors—provided further details regarding Defendant Doctors' fraudulent billing practices.

June 16, 2010—Relator was informed that Trust Solutions, LLC had received his complaint from Medicare.

July 20, 2010—Meeting with Drs. Heinrichs and Patel (Sanford Health MPPs) and Ms. Demarais. In retaliation for making a

report to Medicare about Defendant Doctors' billing practices, Relator receive the first notice termination without cause—sets date of last day of work at August 2, 2010.

July 29, 2010—Relator received from Dr. Patel a second notice termination without cause—date of last day of worked moved out to April 30, 2010.  Termination of Relator's employment is in retaliation for his whistleblowing activities.  However, Dr. Patel told the Relator orally, that the decision to terminate his contract was not final.  Dr. Patel expressly told Relator that he had the opportunity to retain his position, and that the letters were just a technicality to be used, if Sanford Health later decided not to renew his contract.  Defendant Doctors and Northwest continue to cut down on patient referrals.   Also engage in "stealing" Relator's patients.

August 2010—In retaliation for contacting Medicare to complain about Defendant Doctors' billing practices, Relator's office was moved from its location with Northwest to another location in Sanford Health's TRF Clinic.  At the same time as his office was moved and in retaliation for Realtor's whistleblowing activities, Relator's wife was pretextually terminated from her

35

position as Relator's office administrator by Sanford Health Thief River Falls. Referrals to Relator continue to decline resulting in decreased revenues for Relator and increased revenues for Defendant Doctors.

October 22, 2010—Meeting with Dr. Heinrichs. Relator requested an official compliance review by Sanford Health of the Defendant Doctors' billing practices.

October 25, 2010—Relator was summoned to a meeting with Drs. Heinrichs, Patel, and Wall. Meeting was on a Sunday, and held at Dr. Heinrich's house. Relator was told that he had no chance of continued employment with Sanford Health's Thief River Falls Clinic. They specifically mentioned that the Defendant Doctors' revenues far exceeded Relator's and that they knew he had "turned them in to Medicare."

November 2, 2010—Meeting with Dan Olson, Sanford Health North Administrator. Relator strongly expressed his concerns about the Defendant Doctors' behavior. Mr. Olson took no corrective action. Relator again detailed the problems with Defendant Doctors' billing practices and procedures to Mr.Olson, but gets no response.

36

November 15, 2010—Relator received a letter from Dr. Pitts congratulating him on his two-year reappointment to Sanford Clinic North's medical staff.

March 14, 2011—Relator received an email from Dr. Patel with a new "termination with cause" from Sanford Health Thief River Falls. Relator was unable to print a copy of the email. When he later requested a copy of the email from Ms. Demarais, one was not provided. Relator's pretextual termination "for cause" was in retaliation for his whistleblowing events and was contrary to the November 10, 2010 reappointment to Sanford Clinic North's staff and also contrary to what he had been told about being reassigned to a different Sanford Heath facility than the Thief River Falls Clinic.

March 28, 2011—Relator sent a response to Dr. Patel "strongly disputing" his termination with cause and again reporting the suspected violations of law.

On April 12, 2011, Relator met with Ms. Demarais and Ms. Chris Harff, CEO of the hospital and again reported the fraudulent billing practices of the Defendant Doctors. April 30, 2011— Relator's employment with Sanford Health was pretextually

terminated.  Defendant Sanford Health pretextually terminated Relator's employment less than one month after his April 12, 2011 whistleblowing report.

69.   Because of Relator's pretextual termination by Sanford Health, he lost his home to foreclosure in 2012 and suffered other financial difficulties.

70.   Defendant Doctors intentionally and willfully used improper and unlawful tactics to "takeover" the non-surgical treatment of Relator's patients. Borgen and Tjelle purposely and falsely gave patients the impression they could do everything that the Relator could do. This was untrue.  Further, they told patients that the Relator was busy and wanted the patients to go to them for regular eye care.  This was also untrue.  Defendants gave untrue statements to patients to get them not to go to Relator.  When Relator's patient called to set up appointments with the Relator, Northwest's staff instead would set up appointments for the Relator's patients with Borgen and Tjelle, indicating that the Relator was unavailable.

71.   These activities of Dr. Borgen and Tjelle continued from 2002 through 2008 and steadily began to erode Dr. Dicken's patient load at the Thief River Falls Clinic, while increasing Defendant's own practice, as they attempted to do more and more procedures that should have been done by Dr. Dicken.  As a result of the actions of Defendant's Northwest, Borgen and Tjelle, Dr. Dicken's

income was on a downward spiral, year after year.

72.     Relator began whistleblowing about the suspected violations of law with respect to the Defendant Doctors medical practice and billing procedures in August of 2008 and continuing in 2009, 2010 and 2011.

73.     In retaliation for Relator reporting to his superiors the Defendant Doctors' suspected violations of law, the Defendant Doctors maliciously and willfully began a campaign to ruin the Relator's practice, knowing that this would lead to his termination.  Initially they greatly decreased the number of patients they referred to the Relator for ophthalmic procedures until ultimately they virtually stopped referring any patients.  Further, Drs. Borgen and Tjelle began criticizing the Relator's surgical ability to their patients and they also communicated criticism of the Relator directly to the management of Sanford Health.  Drs. Borgen and Tjelle also instructed their staff to direct patients who called the clinic, to other ophthalmologists.

74.     At the time of Relator's pretextual termination, Relator's wife suffered from (and continues to suffer from) a very severe case of autoimmune vasculitis that is debilitating and life threatening.  The cost of her insurance premiums, and treatments not covered by insurance, were substantial.  As a result of Relator's pretextual termination by his employer in retaliation for his whistleblowing activities, the Relator and his wife lost their home and suffered

other financial problems. The collapse of his financial stability in the face of his wife's illness has caused the Relator to suffer mental and emotional distress. Despite this, the Relator has gone to great lengths to provide for his family. He has been forced to drive to North Dakota from Minneapolis regularly several times a month for extended trips in order to continue with his profession and to earn as much as possible to support himself and his wife. The defendants knew of the Relator's wife's illness and his financial burden when he was pretextually terminated on April 30, 2011.

75.   The defendant Doctors submit claims to Medicare under Northwest. There are several reasons the Defendant Doctors have been able to continue their behavior unobstructed. Optometrists are able to "fly under the Medicare radar." Claims are processed without knowing the number of providers in the clinic. Further, the processing of Medicare claims is performed by non-medical personnel who match diagnostic codes to procedural codes, thus making it easier for such fraud to go unnoticed. A review of the amount of Medicare claims paid to Northwest would show the magnitude of the false claims and abuse Relator is reporting.

76.   Upon information and belief, the Defendant Doctors knew of the proper policies, procedures, and criteria for obtaining reimbursements under Medicare. They knowingly violated such policies, procedures, and criteria to

fraudulently obtain greater reimbursement payments than they were entitled to receive.

77.   As set forth above, the Defendant Doctors knowingly and intentionally caused to be submitted untruthful, incorrect, or incomplete requests for payment to Medicare, in violation of 31 U.S.C. § 3729.

78.   As a result of the Defendant Doctors' unlawful conduct, the United States reimbursed Defendants for greater amounts than Defendants were otherwise entitled to receive.

79.   Relator discovered the Defendant Doctors' pattern and practice of performing unnecessary tests and submitting false claims to Medicare while practicing in the same physical location as Northwest and the Defendant Doctors. Relator and the United States did not know, and could not reasonably have known, the facts material to the causes of action pled in this Complaint prior to Relator making the foregoing discoveries.

### APPLICABLE MEDICARE VIOLATIONS BY DEFENDANTS

80.   The claims by the Defendant Doctors were false and fraudulent in that they violated §§ 2100–2102.2 of the Provider Reimbursement Manual. These three sections violated by the Defendant Doctors are listed below.

First, § 2100 of the Provider Reimbursement Manual requires that:

All payments to providers of services must be based on the reasonable cost of services under Title XVIII of the Act and related to the care of

41

beneficiaries. Reasonable cost includes all necessary and proper costs incurred in rendering the services subject to principles relating to specific items of revenue and cost.

Second, § 2102.1 of the Provider Reimbursement Manual requires that:

[A]ctual costs be paid to the extent they are reasonable . . . [meaning they] do not exceed what a prudent and cost-conscious buyer pays for a given item or service. If costs are determined to exceed the level that such buyers incur, in the absence of clear evidence that the higher costs were unavoidable, the excess costs are not reimbursable under the program.

Third, § 2102.02 of the Provider Reimbursement Manual requires that costs related to patient care only:

[I]nclude all necessary and proper costs, which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. Necessary and proper costs related to patient care are usually costs which are common and accepted occurrences in the field of the provider's activity. They include personnel costs, administrative costs, costs of employee pension plans, normal standby costs, and others. Allowability of costs is subject to the regulations prescribing the treatment of specific items under the Medicare program.

By way of the wrongful acts described in paragraphs 17 through 52, the Defendant Doctors violated the above three sections of the Provider Reimbursement Manual.

## FIRST CAUSE OF ACTION

### AGAINST NORTHWEST, BORGEN, AND TJELLE FOR VIOLATIONS FALSE CLAIMS ACT (31 U.S.C. §§ 3729(a)(1)(A) and (B))

81.     Relator repeats and repleads and incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

82.    Between in or about July 2002 and in or about the filing of this Complaint, the Defendants (a) knowingly presented to the United States, or caused to be presented to the United States, false and fraudulent claims for payment or approval; and (b) knowingly made, used, or caused to be made or used, false records or statements material to false and fraudulent claims to the United States, all in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (B).

83.    The foregoing acts by the Defendant Doctors were wrongful in the following respects:

       A.    In violation of 31 U.S.C. § 3729(a)(1)(A), the Defendant Doctors knowingly, and with intent to defraud the United States, presented false and fraudulent claims for payment or approval.

       B.    In violation of 31 U.S.C. § 3729(a)(1)(B), the Defendant Doctors knowingly, and with intent to defraud the United States, made and used false records material to false and fraudulent claims.

       C.    The claims were false and fraudulent because they violated § 2100 of the Provider Reimbursement Manual, which requires that all payments to providers of services must be based on the reasonable cost of services under Title XVIII of the Act and

related to the care of beneficiaries.  Reasonable cost includes all necessary and proper costs incurred in rendering the services subject to principles relating to specific items of revenue and cost.

D.     The claims were false and fraudulent because they violated § 2102.1 of the Provider Reimbursement Manual, which requires actual costs be paid to the extent they are reasonable, meaning they do not exceed what a prudent and cost-conscious buyer pays for a given item or service. If costs are determined to exceed the level that such buyers incur, in the absence of clear evidence that the higher costs were unavoidable, the excess costs are not reimbursable under the program.

E.     The claims were false and fraudulent because they violated § 2102.2 of the Provider Reimbursement Manual, which requires that costs related to patient care include all necessary and proper costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities.  Necessary and proper costs related to patient care are usually costs which are common and accepted occurrences in the field of the provider's activity.   They include personnel

costs, administrative costs, costs of employee pension plans, normal standby costs, and others. Allow ability of costs is subject to the regulations prescribing the treatment of specific items under the Medicare program.

84. The Defendant Doctors set about a course to obtain from the government money that was not due to them by filing false Medicare claims. The Defendant Doctors took money from the government under false pretenses from July 2002 onward.

85. The Defendant Doctors routinely, knowingly, intentionally, and with scienter represented to the government that they had provided services that should be reimbursed under Medicare when that was not true, as follows:

A. The Defendant Doctors routinely, knowingly, intentionally, and with scienter used insufficient documentation for the level of coding used to bill Medicare.

B. The Defendant Doctors routinely intentionally, knowingly, and with scienter bill Medicare for procedures that provide no value to the patient, or for tests that are not indicated by the patient's diagnosis, frequently by abusing CPT Codes 92250 (fundus photos), 92135 (HRT), 92082/92083 (visual fields), 92225/92226 (extended ophthalmoscopy), and 92020

45

(gonioscopy).

C.  The Defendant Doctors routinely, knowingly, intentionally, and with scienter routinely bill Medicare for services not rendered, frequently by abusing CPT Codes 92225 and 92226 (extended ophthalmoscopy).

D.  The Defendant Doctors routinely, knowingly, intentionally, and with scienter routinely make false diagnoses to justify tests and procedures billed to Medicare that do not reflect the patient's actual condition, frequently by abusing ICD-9 Code 362.83 (macular edema).

E.  Records for many of the patients seen by the Defendant Doctors contain one or more of the above violations, collectively estimated to amount to more than a million dollars of false and fraudulent claims paid to the Defendant Doctors.

F.  Upon information and belief, the Defendant Doctors knew of the proper policies, procedures, and criteria for obtaining reimbursements under Medicare. They knowingly violated such policies, procedures, and criteria to fraudulently obtain greater reimbursement payments than they were entitled to receive.

G.  The Defendant Doctors have routinely, knowingly,

intentionally, and with scienter not followed proper standards for making Medicare claims.

86.   Relator has identified and procured material evidence for a number of different methods by which the Defendant Doctors have fraudulently obtained wrongful reimbursement from Medicare. The Relator has observed the Defendant Doctors submit false claims for Medicare from July 2002. He has personal knowledge that Defendants submitted the foregoing false information to Medicare on claims from July 2002.

87.   As set forth above, the Defendant Doctors knowingly and intentionally submitted or caused to be submitted untruthful, incorrect, or incomplete requests for payment to Medicare, in violation of 31 U.S.C. § 3729(a)(1)(A) and (B).

88.   As a result of Defendants' unlawful conduct, the United States reimbursed Defendant for greater amounts than they were entitled to receive.

89.   Relator discovered the Defendant Doctors' pattern and practice of performing unnecessary tests and submitting and conspiring to submit false claims to Medicare while practicing in the same physical location as Northwest and the Defendant Doctors.

90.   Relator and the United States did not know, and could not reasonably have known, the facts material to the causes of action pled in this Complaint prior

to Relator making the foregoing discoveries.

91.    The Relator observed the Defendant Doctors file the false claims set forth herein. The foregoing false claims by the Defendant Doctors were made of a past and present fact. They were susceptible of knowledge.

92.    The foregoing intentional and false claims with scienter by the Defendant Doctors in 2002, 2003, 2004, and afterward were material and susceptible to knowledge.

93.    At the time the Defendant Doctors made the foregoing false claims from July 2002 onward, they understood that they were misleading. The Defendant Doctors fraudulently misled the government and Medicare into into believing that the Defendant Doctors were owed more payments from the Medicare program than they were actually entitled to receive.

94.    By their foregoing unauthorized acts and false claims, the Defendant Doctors damaged the government.

95.    The Defendant Doctors intended that the government be induced to act, or would be justified in so acting, by reimbursing the Defendants based on the false claims submitted to Medicare.

96.    Based upon the foregoing false claims by the Defendant Doctors, the government paid money to Defendants that was not due to them.

97.    The government was ignorant of the falsity of the Defendant Doctors'

false claims, omissions and concealments.

98.    The government believed the Defendant Doctors' claims to be true, and reasonably relied on their truth and accuracy.

99.    In reliance on the Defendant Doctors' false claims, the government paid more money to the Defendants from July 2002 onward than they would otherwise have been entitled to receive had their claims for reimbursement not been fraudulent.

100.   The damage experienced by the government was related to the foregoing false claims of the Defendants.  The government suffered damage by making payments to the Defendants.

101.   Had the government known of the true facts, it would not have taken the above such actions.

102.   The government has not discovered the false claims after the original acts of fraud by the Defendant Doctors.

103.   As a direct and proximate result of the Defendant Doctors' false claims, the government has been damaged.

104.   By virtue of this scheme, the Defendant Doctors defrauded the United States and the Medicare Program of a substantial amount, estimated by Relator to be more than a million dollars, to be determined at trial.

**SECOND CAUSE OF ACTION**

### AGAINST NORTHWEST, BORGEN, AND TJELLE FOR CONSPIRACY TO VIOLATED THE FALSE CLAIMS ACT (31 U.S.C. 3729(a)(1)(C))

105. Relator repeats and repleads and incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

106. The Defendant Doctors combined, conspired, and agreed together to defraud the United States by knowingly submitting false claims to the United States and to its grantees for the purpose of getting the false or fraudulent claims paid or allowed and committed the other overt acts below in furtherance of that conspiracy, all in violation of 31 U.S.C. § 3729(a)(1)(C), causing damage to the United States.

107. Between in or about July 2002 and in or about the filing of this Complaint, the Defendants conspired to (a) knowingly present to the United States, or cause to be presented to the United States, false and fraudulent claims for payment or approval; and (b) conspired to knowingly make, use, or cause to be made or used, false records or statements material to false and fraudulent claims to the United States, all in violation of 31 U.S.C. §§ 3729(a)(1)(C).

108. The foregoing acts by the Defendant Doctors were wrongful in the following respects:

    A. In violation of 31 U.S.C. § 3729(a)(1)(A), the Defendant Doctors conspired to knowingly, and with intent to defraud the

United States, by presenting false and fraudulent claims for payment or approval.

B.  In violation of 31 U.S.C. § 3729(a)(1)(B), the Defendant Doctors conspired to knowingly, and with intent to defraud the United States, make and use false records material to false and fraudulent claims.

C.  The conspiracy to submit claims that were false and fraudulent violated § 2100 of the Provider Reimbursement Manual, which requires that all payments to providers of services must be based on the reasonable cost of services under Title XVIII of the Act and related to the care of beneficiaries.  Reasonable cost includes all necessary and proper costs incurred in rendering the services subject to principles relating to specific items of revenue and cost.

D.  The conspiracy to submit claims that were false and fraudulent because they violated § 2102.1 of the Provider Reimbursement Manual, which requires actual costs be paid to the extent they are reasonable, meaning they do not exceed what a prudent and cost-conscious buyer pays for a given item or service. If costs are determined to exceed the level that such buyers incur, in the

absence of clear evidence that the higher costs were unavoidable, the excess costs are not reimbursable under the program.

E. The conspiracy to submit claims that were false and fraudulent because they violated § 2102.2 of the Provider Reimbursement Manual, which requires that costs related to patient care include all necessary and proper costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. Necessary and proper costs related to patient care are usually costs which are common and accepted occurrences in the field of the provider's activity. They include personnel costs, administrative costs, costs of employee pension plans, normal standby costs, and others. Allow ability of costs is subject to the regulations prescribing the treatment of specific items under the Medicare program.

109. The Defendant Doctors conspired to obtain from the government money that would not otherwise be due to them by filing false Medicare claims. The Defendant Doctors conspired to take money from the government under false pretenses from July 2002 onward.

110. The Defendant Doctors conspired to knowingly, intentionally, and

with scienter represent to the government that they were providing services that should be reimbursed under Medicare when that was not true, as follows:

A.   The Defendant Doctors conspired to knowingly, intentionally, and with scienter used insufficient documentation for the level of coding used to bill Medicare.

B.   The Defendant Doctors conspired to intentionally, knowingly, and with scienter bill Medicare for procedures that provide no value to the patient, or for tests that are not indicated by the patient's diagnosis, frequently by abusing CPT Codes 92250 (fundus photos), 92135 (HRT), 92082/92083 (visual fields), 92225/92226 (extended ophthalmoscopy), and 92020 (gonioscopy).

C.   The Defendant Doctors conspired to knowingly, intentionally, and with scienter routinely bill Medicare for services not rendered, frequently by abusing CPT Codes 92225 and 92226 (extended ophthalmoscopy).

D.   The Defendant Doctors conspired to knowingly, intentionally, and with scienter routinely make false diagnoses to justify tests and procedures billed to Medicare that do not reflect the patient's actual condition, frequently by abusing ICD-9 Code

362.83 (macular edema).

E.     Records for many of the patients seen by the Defendant Doctors contain one or more of the above violations, collectively estimated to amount to more than a million dollars of false and fraudulent claims paid to the Defendant Doctors.

F.     Upon information and belief, the Defendant Doctors knew of the proper policies, procedures, and criteria for obtaining reimbursements under Medicare. They knowingly conspired to violate such policies, procedures, and criteria to fraudulently obtain greater reimbursement payments than they were entitled to receive.

G.     The Defendant Doctors have routinely, knowingly, intentionally, and with scienter conspired to not follow proper standards for making Medicare claims.

111.   Relator has identified and procured material evidence for a number of different methods by which the Defendant Doctors conspired to fraudulently obtain wrongful reimbursement from Medicare.  The Relator has observed the Defendant Doctors submit false claims for Medicare from July 2002.  He has personal knowledge that Defendants submitted the foregoing false information to Medicare on claims from July 2002.

54

112.  As set forth above, the Defendant Doctors knowingly and intentionally conspired to submit or cause to be submitted untruthful, incorrect, or incomplete requests for payment to Medicare, in violation of 31 U.S.C. § 3729.

113.  As a result of Defendants' unlawful conduct, the United States reimbursed Defendants for greater amounts than they were entitled to receive.

114.  Relator discovered the Defendant Doctors' pattern and practice of performing unnecessary tests and submitting and conspiring to submit false claims to Medicare while practicing in the same physical location as Northwest and the Defendant Doctors.

115.  Relator and the United States did not know, and could not reasonably have known, the facts material to the causes of action pled in this Complaint prior to Relator making the foregoing discoveries.

116.  The Relator observed the Defendant Doctors conspire to file the false claims set forth herein. The foregoing false claims by the Defendant Doctors were made of a past and present fact.  They were susceptible of knowledge.

117.  The Defendant Doctors in 2002, 2003, 2004, and afterward conspired to file false claims was intentional, made knowingly and with scienter and was material and susceptible to knowledge.

118.  At the time the Defendant Doctors conspired to make the foregoing false claims from July 2002 onward, they understood that the claims were

misleading.   The Defendant Doctors conspired to fraudulently mislead the government and Medicare into believing that the Defendant Doctors were owed more payments from the Medicare program than they were actually entitled to receive.

119.   By their foregoing conspiracy to commit unauthorized acts and false claims, the Defendant Doctors damaged the government.

120.   The Defendant Doctors intended that the government be induced to act, or would be justified in so acting, by reimbursing the Defendants based on the false claims submitted to Medicare.

121.   Based upon the foregoing conspiracy to file false claims by the Defendant Doctors, the government paid or would have paid money to Defendants that was not due to them.

122.   The government was ignorant of the conspiracy and the falsity of the Defendant Doctors' claims, omissions and concealments.

123.   The Defendant Doctors conspired to make the government believe the Defendant Doctors' claims to be true, and to reasonably rely on the truth and accuracy of the false claims.

124.   In reliance on the Defendant Doctors' false claims, the government paid more money to the Defendants from July 2002 onward than they would otherwise have been entitled to receive had their claims for reimbursement not

been fraudulent.

125.   The damage experienced by the government was related to the foregoing conspiracy to file false claims of the Defendants.   The government suffered damage by making payments to the Defendants.

126.   Had the government known of the true facts, it would not have taken the above such actions.

127.   The government has not discovered the false claims after the original acts of fraud by the Defendant Doctors.

128.   As a direct and proximate result of the Defendant Doctors' false claims, the government has been damaged.

129.   By virtue of this scheme, the Defendant Doctors defrauded the United States and the Medicare Program of a substantial amount, estimated by Relator to be more than a million dollars, to be determined at trial.

## THIRD CAUSE OF ACTION

### AGAINST SANFORD HEALTH FOR RETALIATION FOR WHISTLEBLOWING
### In Violation of the False Claims Act
### (31 U.S.C. § 3730(h))

130.   Relator repeats and repleads and incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

131.   Relator was employed by MeritCare from on or about April 1, 2009 until MeritCare was acquired by Sanford Health on or about January 1, 2010.

Thereafter, Relator became an employee of Sanford Health until April 30, 2011, when he was pretextually terminated by Sanford Health.

132.   During his employment with MeritCare and Sanford Health, Relator made good faith reports of suspected violations of law and fraudulent Medicare billing by the Defendant Doctors to his superiors and other senior management. Eventually Relator made a report directly to Medicare on April 16, 2010. The Relator continued to report the suspected violations of law and fraudulent Medicare billing to Sanford Health through April 12, 2011.

133.   On or about June 15, 2010, Relator again expressed his concerns to Sanford Health management that the Defendant Doctors were violating the law and submitting fraudulent claims to Medicare.

134.   In July 2010 the Relator was given two notices of termination in retaliation for Relator's reports to his superiors of the Defendant Doctor's suspected violations of law and violated 31 U.S.C. § 3730(h).  However, Dr. Patel told the Relator orally, that the decision to terminate his contract was not final.  Dr. Patel expressly told Dr. Dicken that he had the opportunity to retain his position, and that the letters were just a technicality to be used if Sanford Health later decided not to renew his contract.

135.   In August 2010, Sanford Health Thief River Falls unnecessarily relocated Relator's office from the Northwest location to one in its Thief River

Falls clinic.  At the same time, Sanford Health Thief River Falls terminated Relator's wife's employment as his office administrator.

136.  On or about October 22, 2010 Relator met with Dr. Heinrichs of Sanford Health and again reported the Defendant Doctors' suspected violations of law.  Relator further requested an official compliance review by Sanford Health of the Defendant Doctors' billing practices.

137.  Relator continued to report his concerns about the Defendant Doctors' medical practice and billing.  The representatives of MeritCare and Sanford Health told Relator that he was being terminated "because of the situation with Drs. Borgen and Tjelle."

138.  On or about October 25, 2010, Relator was summoned to a meeting with Doctors Heinrichs and Patel and was informed by them that he had no chance of continued employment with Sanford Health Thief River Falls.  Relator was told specifically that the Defendant Doctors' revenues far exceeded the Relator's revenues and that they knew that Relator had reported them to Medicare.  The actions of Doctors Heinrichs and Patel were in retaliation for Relator's reports to his superiors and Medicare of the Defendant Doctor's suspected violations of law and violated 31 U.S.C. § 3730(h).

139.  On or about November 02, 2010, Relator met with the Sanford Health North Administrator and again reported the Defendant Doctors' suspected

violations of law.

140.   On or about November 15, 2010, Relator received a letter from Dr. Pitts, the chief physician manager for Sanford Health, located at Sanford Health's Fargo North Dakota offices, congratulating Relator on being reappointed to Sanford Health's medical staff for an additional two years.   This letter was consistent with communications the Relator had with Dr. Patel that notwithstanding the prior statements that he would be terminated, that he could still remain employed by Sanford Health and that he could be reassigned to another Sanford Health Clinic in a different location.

141.   On or about March 14, 2011, Relator received an email from Dr. Patel stating Relator was being "terminated with cause."

142.   The March 14, 2011 email from Dr. Patel reflected that Sanford Health knew that its prior notices Relator were invalid under the terms of the Employment Agreement and that Relator had been led to believe that he could continue to be a Sanford health employee.

143.   The March 14, 2011 email was also invalid notice under the terms of the Employment Agreement.

144.   The March 14, 2011 email stating Relator was being "terminated for cause" was in retaliation for Relator's reports to his superiors of the Defendant Doctor's suspected violations of law and violated 31 U.S.C. § 3730(h).

145.   On or about March 28, 2011, Relator responded to Dr. Patel's March 14, 2011 email strongly disputing Sanford Health's decision to terminate him "with cause."   A copy of Relator's response is attached hereto as Exhibit C and incorporated herein by reference. Sanford Health further retaliated against the Relator by failing to comply with its own disciplinary procedures throughout April 2011, until his pretextual termination on April 30, 3011.   The Relator had a substantial interest in challenging the asserted cause for his termination, in that the assertion he was terminated "for cause" was pretextual and substantially impacted his ability to obtain employment in the future.   Sanford Health ignored the Relator's objections, and failed to take any actions with respect to his complaints.

146.   On April 30, 2011, Relator's employment with Sanford Health was pretextually terminated.   The termination of Relator's employment on April 30, 2011, was in retaliation for Relator's reports to his superiors of the Defendant Doctor's suspected violations of law and violated 31 U.S.C. § 3730(h).

147.   The reason stated by Sanford Health for Relator's termination as set forth in the Sanford Health Termination Form, which is attached hereto as Exhibit B and incorporated herein by reference, states:

> Dr. Dicken is been [sic] terminated because he has failed to maintain good relation [sic] with local optometrist( [sic] referrals have completely dried up) and he has not be [sic] able grow [sic] the practice.  The eye department is on a down ward [sic] spiral and will need a complete redo.

148.   Sanford Health's pretextual termination of Relator's employment was

not due to issues related to his competency as a doctor or his ability to perform the duties and responsibilities as a medical provider.   The Sanford Health Final Competency Assessment, a copy of which is attached hereto as Exhibit D and incorporated herein by reference, shows Relator fully competent in all areas except "Leadership" in which he was rated "Needs Improvement."  This "assessment" of Relator's leadership skills relates directly to his supposed failure to maintain good relations with the local optometrists, which were the subjects in the *qui tam*. "Lack of leadership" is a euphemism for refusal to participate in helping others defraud the government and do a disservice to patients. See Exhibit D, which is attached hereto and incorporated herein by reference. The Defendant's assessment of Relator's leadership was untrue and used as a pretext to terminate his employment in retaliation for his whistleblowing.

149.  Sanford Health unlawfully retaliated against the relator on or about April 30, 2011 when it created false and misleading documentation stating that the Relator was terminated "for cause," and asserting that he was being terminated for lack of leadership.  This documentation in the files of Sanford Health made it all but impossible for Relator to obtain employment with any other medical group. Such organizations are required by law to perform due diligence on the physicians they hire and they would not want to hire anyone who was so recently fired "for cause."  The actions of Sanford Health were known to harm Relator's

employability.  Defendant Sanford Health engaged in actions that were a form of blackballing Relator.  Minn. Stat. § 179.60.

150.   Relator made good faith reports of the Defendant Doctors' suspected violations of law and submitting fraudulent claims to Medicare to his superiors at MeritCare and subsequently Sanford Health on numerous occasions.

151.   Relator made a good faith report to Medicare of the Defendant Doctors' suspected violations of law.  Relator made good faith reports to Sanford Health of the Defendant Doctors' violations of law.  After each reporting event, the Defendant Doctors further escalated their retaliation against Relator by decreasing referrals to Relator, "stealing" existing patients, redirecting patients calling for an appointment with Relator to themselves, and discouraging potential patients from going to Relator for care.

152.   Relator reported the Defendant Doctors' violations of law on multiple occasions including, but not limited to, his April 16, 2010 in a letter to the Office of the Inspector General and on October 22, 2010 to MeritCare, Sanford Health and Dr. R. W. Heinrichs, on November 2, 2010 to Dan Olson, March 28, 2011 to Dr. Patel and on April 12, 2011 to Nancy Demarais, administrator, and Chris Harff, the hospital CEO.  Relator was wrongfully and pretextually terminated on April 30, 2011 shortly after his April 12, 2011 whistleblowing report to Demarais and Harff in retaliation for his whistleblowing in violation of 31 U.S.C. § 3730(h).

153.   On or about June 16, 2010 Relator received notification that his complaint to Medicare had been received by Trust Solutions, LLC.

154.   On July 20, 2010, Relator received the first notice of "termination without cause" ostensibly from MeritCare, setting his last day of employment as August 2, 2010.

155.   A second notice of termination was issued on July 29, 2010, ostensibly from Sanford Health, setting his last date of employment as April 30, 2011, supposedly to give Relator ample time to be able to transfer his patients.

156.   Relator was told by Dr. Patel that the decision to terminate his employment was not final and that the letters were a technicality to be used in the event it was decided that his contract of employment would not be renewed.

157.   In August of 2010, Relator's office was moved from the Northwest location to a location in the Thief River Falls Clinic.  This action was in retaliation for Relator's whistleblowing and to keep Relator from being able to observe the Defendant Doctors' fraudulent billing practices and unnecessary medical procedures.   At the same time, Sanford Health terminated Relator's wife's employment as his office administrator in retaliation for his whistleblowing activities.

158.   On October 22, 2010, Relator met with Dr. Heinrichs and requested a formal compliance review on one of Dr. Heinrichs' own patients who the

Defendant Doctors had treated and fraudulently billed Medicare.

159.   Two days later, Relator was summoned to meet with Drs. Heinrichs, Patel and Wall at which time Relator was told he had no chance of continued employment with Sanford Health Thief River Falls—specifically mentioning that the Defendant Doctors' revenues far exceeded Relator's revenues and that they knew that Relator had contacted Medicare and made a complaint.

160.   Relator made another report on November 2, 2010 to Dan Olson.

161.   On November 15, 2010, Relator received a letter from Dr. Pitts congratulating him on his two-year reappointment to Sanford Clinic North. A copy of the letter is attached hereto as Exhibit E and incorporated herein by reference.

162.   On March 14, 2011, Relator received an email notice from Dr. Patel terminating his employment "for cause," effective April 30, 2011.

163.   On March 28, 2011, Relator responded to Dr. Patel's email and again reported the patient care, fraudulent billing practices and unethical practices of the Defendant Doctors.

164.   After his March 28, 2011 letter to Dr. Patel, Relator met with Ms. Nancy Demarais, the administrator, and Chris Harff, the hospital CEO, on April 12, 2011, and again verbally reported the suspected violations of law on the part of the Defendant Doctors.

165.   Sanford Health wrongly retaliated against Relator and engaged in

reprisal against him culminating in the wrongful and pretextual termination of Relator's employment on April 30, 2011 in violation of violated 31 U.S.C. § 3730(h). Plaintiff suffered retaliation due to his having made previous reports to MeritCare, Sanford Health, Northwest and Medicare regarding suspected violations of law by the Defendant Doctors.

166. As a direct and proximate result of the wrongful retaliation in violation of 31 U.S.C. § 3730(h), Realtor has suffered injury, loss of insurance coverage, loss of wages and benefits, loss of raises, suffered a loss of reputation and standing in his community, loss of promotions, loss of referrals, loss of employment opportunities, loss of back pay, loss of interest on back pay. Increased insurance premiums, expenses related to maintaining his certifications, expenses relate to meeting continuing education requirements, expenses related to on-going malpractice coverage, attorneys' fees and costs related to this litigation, as well as mental and emotional distress.

167. The Defendants' actions are the direct and proximate cause of damage to Relator. The Defendants' aforementioned wrongful acts in violation of 31 U.S.C. § 3730(h) has caused Relator to suffer monetary damages and has caused Relator damages for mental and emotional distress. Relator has been damaged by the defendants' violations of 31 U.S.C. § 3730(h) in excess of $75,000.00.

### FOURTH CAUSE OF ACTION

**AGAINST SANFORD HEALTH FOR RETALIATION IN
VIOLATION OF THE MINNESOTA WHISTLEBLOWER ACT
(MINNESOTA STATUTE § 181.932, *ET SEQ.***

168.  Relator repeats and repleads and incorporates by reference each and
every one of the preceding paragraphs as though fully set forth herein.

169.  Relator was employed by MeritCare from on or about April 1, 2009
until MeritCare was acquired by Sanford Health on or about January 1, 2010.
Thereafter, Relator became an employee of Sanford Health Thief River Falls until
April 30, 2011, when he was terminated by Sanford Health.

170.  During 2009, 2010 and 2011, Relator made good faith reports of
suspected violations of law by Defendant Doctors with respect to their billing
practices and subjecting patients to medically unnecessary procedures.

171.  Following his reports of the suspected violations of law, the
Defendant Doctors orchestrated a scheme of decreasing the number of patients
seen by Relator, "stealing" existing patients, and diverting prospective patients in
retaliation for Relator's whistleblowing.   As Relator continued to report the
Defendant Doctors' suspected violations of law, they escalated the scheme to
damaged Relator and his medical practice.   The steady decline in the numbers of
patients Relator was able to see resulted in a significant decrease in Relator's
revenues, which resulted in further threats against his continued employment made
by Sanford Health Thief River Falls.

172.   During his employment with MeritCare and Sanford Health, Relator made good faith reports of suspected violations of law and fraudulent Medicare billing by the Defendant Doctors to his superiors and other senior management. Eventually Relator made a report directly to Medicare on April 16, 2010. The Relator continued to report the suspected violations of law and fraudulent Medicare billing to MeritCare/Sanford Health from 2009 through April 12, 2011.

173.   On or about January 1, 2010, Relator became an employee of Sanford Health when its acquisition of MeritCare became final.

174.   On or about April 16, 2010, Relator reported the suspected violations of law by the Defendant Doctors to Medicare.

175.   On or about June 15, 2010, Relator again expressed to MeritCare his concerns to Sanford Health management that the Defendant Doctors were violating the law and submitting fraudulent claims to Medicare.

176.   On or about June 16, 2010, Relator was informed by Trust Solutions, Inc., that it had received his complaint from Medicare.

177.   On July 20, 2010, Relator received the first notice of "termination without cause" ostensibly from MeritCare, setting his last day of employment as August 2, 2010.

178.   A second notice of termination "without cause" was issued on July 29, 2010, ostensibly from Sanford Health, setting his last date of employment as April

30, 2011, supposedly to give Relator ample time to be able to transfer his patients.

179.   However, his manager, Dr. Patel, told the Relator orally, that the decision to terminate his contract was not final.  Dr. Patel expressly told Relator that he had the opportunity to retain his position, and that the letters were just a technicality to be used if Sanford Health later decided not to renew his contract.

180.   On or about August of 2010, Relator's office was unnecessarily moved from its location within Northwest to a location within Sanford Health's Thief River Falls, Minnesota clinic.  This move was in retaliation for Relator's reports of the Defendant Doctors' suspected violations of law to his superiors.  In addition, Relator's wife was terminated by Sanford Health in retaliation for his whistleblowing activities.

181.   On or about October 22, 2010 Relator met with Dr. Heinrichs of Sanford Health and again reported the Defendant Doctors' suspected violations of law.  And Relator further requested an official compliance review by Sanford Health of the Defendant Doctors' billing practices.

182.   On or about October 25, 2010, Relator was summoned to a meeting with Doctors Heinrichs and Patel and was informed by them that he had no chance of continued employment with Sanford Health Thief River Falls.  Relator was told specifically that the Defendant Doctors' revenues far exceeded the Relator's revenues and that they knew that Relator had reported them to Medicare.  The

actions of Doctors Heinrichs and Patel were in retaliation for Relator's reports to his superiors and Medicare of the Defendant Doctor's suspected violations of law and violated Minn. Stat. § 181.932.

183.   On or about November 2, 2010, Relator met with Dan Olson and again reported the Defendant Doctors' suspected violations of law.

184.   On or about November 15, 2010, Relator received a letter from Dr. Pitts, the chief physician manager for Sanford Health, located at Sanford Health's Fargo North Dakota offices, congratulating Relator on being reappointed to Sanford Clinic North's medical staff for an additional two years.  A copy of the letter is attached hereto as Exhibit E and incorporated herein by reference.  This letter was consistent with communications the Relator had with Dr. Patel that notwithstanding to the prior statements that he would be terminated, that he could be reassigned to another Sanford Health Clinic in a different location.

185.   On or about March 14, 2011, Relator received an email notice from Dr. Patel stating that he was being "terminated with cause."  The March 14, 2011 email stating notifying Relator that he was being "terminated for cause" was in retaliation for Relator's reports to his superiors of the Defendant Doctor's suspected violations of law and violated Minn. Stat. § 181.932.

186.   On or about March 28, 2011, Relator responded to Dr. Patel's March 14, 2011 email strongly disputing Sanford Health's decision to terminate him

"with cause" and again reporting the Defendant Doctors' suspected violations of law.  A copy of Relator's response is attached hereto as Exhibit B and incorporated herein by reference.

187.   On April 12, 2011, Relator met with Nancy Demarais, administrator, and Chris Harff, the hospital CEO, and again reported the Defendant Doctors' suspected violations of law.

188.  Sanford Health further retaliated against the Relator by failing to comply with its own disciplinary procedures throughout April 2011, until his pretextual termination on April 30, 3011.  The Relator had a substantial interest in challenging the asserted cause for his pretextual termination, in that the assertion he was terminated "for cause" substantially impacted his ability to obtain employment in the future.  Sanford Health ignored the Relator's objections, and failed to take any actions with respect to his complaints.

189.   On April 30, 2011, Relator's employment with Sanford Health was terminated. The pretextual termination of Relator's employment on April 30, 2011, was in retaliation for Relator's reports to his superiors about the Defendant Doctor's suspected violations of law and violated Minn. Stat. § 181.932.

190.   The reason stated by Sanford Health for Relator's termination as set forth in the Sanford Health Termination Form, which is attached hereto as Exhibit B and incorporated herein by reference, states:

Dr. Dicken is been [sic] terminated because he has failed to maintain good relation [sic] with local optometrist( [sic] referrals have completely dried up) and he has not be [sic] able grow [sic] the practice. The eye department is on a down ward [sic] spiral and will need a complete redo.

191.   Sanford Health's wrongful and pretextual termination of Relator's employment was not due to issues related to his competency as a doctor or his ability to perform the duties and responsibilities as a medical provider.   The Sanford Health Final Competency Assessment, a copy of which is attached hereto as Exhibit D and incorporated herein by reference, shows Relator fully competent in all areas except "Leadership" in which he was rated "Needs Improvement." This "assessment" of Relator's leadership skills relates directly to his supposed failure to maintain good relations with the local optometrists, which were the subjects in the *qui tam*. "Lack of leadership" is a euphemism for refusal to participate in helping others defraud the government and do a disservice to patients. See, Exhibit D, which is attached hereto and incorporated herein by reference.   The Defendant's assessment of Relator's leadership was untrue and used as a pretext to terminate his employment in retaliation for his whistleblowing.

192.   Sanford Health unlawfully retaliated against the relator on or about April 30, 2011 when it created false and misleading documentation stating that the Relator was terminated "for cause," and pretextually asserting that he was being terminated for lack of leadership.   This documentation in the files of Sanford Health made it all but impossible for Relator to obtain employment with any other

medical group.  Such organizations are required by law to perform due diligence on the physicians they hire and they would not want to hire anyone who was so recently fired "for cause".  The actions of Sanford Health were known to harm Relator's employability and were a form of blackballing.  Minn. Stat. § 179.60.

193.   Relator made good faith reports of the Defendant Doctors' suspected violations of law to his superiors at MeritCare and subsequently Sanford Health on numerous occasions.

194.   Relator made a good faith report to Medicare of the Defendant Doctors' suspected violations of law.

195.   Relator made good faith reports to MeritCare and Sanford Health of the Defendant Doctors' violations of law.

196.   Relator verbally reported the Defendant Doctors violations of law on multiple occasions prior to April 16, 2010, on April 16, 2010 in a letter to the Office of the Inspector General, on October 22, 2010 to MeritCare, Sanford Health and Dr. R. W. Heinrichs, on November 2, 2010 to Dan Olson, on March 28, 2011 to Dr. Patel in Relator's response to the March 14, 2011 email terminating Relator's employment "for cause" and in the April 12, 2011 meeting with Nancy Demarais, administrator, and Chris Harff, the hospital CEO.

197.   As a result of his reports of the Defendant Doctors' suspected violations of law, Sanford retaliated against Relator with respect to the terms and

conditions of his employment, threatened him, and ultimately pretextually terminated his employment on April 30, 2011, all in violation of Minn. Stat. § 181.932.

198.   Sanford Health wrongfully retaliated against Relator and engaged in reprisal against him culminating in the pretextual termination of Relator's employment on April 30, 2011 in violation of Minn. Stat. § 181.932.   Plaintiff suffered retaliation due to his having made previous reports to MeritCare, Sanford Health, and Medicare regarding suspected violations of law by the Defendant Doctors.

199.   As a direct and proximate result of retaliation in violation of Minnesota Statute § 181.932, Realtor has suffered injury, loss of insurance coverage, loss of wages and benefits, loss of raises, suffered a loss of reputation and standing in his community, loss of promotions, loss of referrals, loss of employment opportunities, loss of back pay, loss of interest on back pay, increased insurance premiums, expenses related to maintaining his certifications, expenses relate to meeting continuing education requirements, expenses related to on-going malpractice coverage, attorneys' fees and costs related to this litigation, as well as mental and emotional distress.

200.   The defendants' aforementioned wrongful acts in violation of Minnesota Statute § 181.932 has caused Relator to suffer monetary damages and

74

has caused Relator damages for mental and emotional distress. Relator has been damaged by the violations of Minnesota Statute § 181.932 in excess of $75,000.00.

### FIFTH CAUSE OF ACTION

### AGAINST SANFORD HEALTH FOR BREACH OF CONTRACT

201.  Relator repeats and repleads and incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

202. On or about January 26, 2008, Relator entered into a written Employment Agreement ("Agreement") with MeritCare Medical Group, a North Dakota non-profit corporation. The Employment Agreement between Relator and MeritCare was a contract, supported by consideration that defined the rights, duties responsibilities and obligations of both parties to the contract, established that Relator and was qualified to perform the services contracted for.

203.  Sanford Health acquired MeritCare and became the Relator's employer under the written employment contract on or about January 1, 2010.

204.  Sanford Health breached the terms of the written employment contract in retaliation for Relator's whistleblowing by failing and refusing to provide to Relator the equipment and support services necessary for Relator to practice his specialty.

205.  Sanford Health further breached the terms of the written employment contract in retaliation for Relator's whistleblowing when it failed to give proper

notices to Relator in the method prescribed in the written contract.

206.   Sanford Health further breached the written employment contract in retaliation for Relator's whistleblowing when it wrongfully and pretextually terminated Relator's employment.

207.   Relator was damaged as a result of Sanford Health's retaliatory breaches of the written employment contract.

208.   Sanford Health's retaliatory breaches of the written employment contract were the direct and proximate cause of the damages to Relator.

209.   Section 1 of the Agreement governing the term and duration of the Agreement states as follows:

> MeritCare employs Physician as a member of its staff, and Physician hereby accepts such employment, until terminated by either party in the manner provided in Section 11.

210.   Section 11 of the Agreement, a copy of which is attached hereto as Exhibit C and incorporated herein by reference, governs the termination of the Agreement and states in pertinent part:

> This Agreement may be terminated by either the Physician pr MeritCare, with or without cause, at any time during the term of this Agreement effective ninety (90) days after written notice of termination is received by the other party.  Notice may be served upon either party by certified mail, return receipt requested, or by personal service.  If mailed, notice shall be deemed served three (3) days after the date the notice is postmarked. Personal service may be accomplished in the same manner as permitted under the Minnesota Rules of Civil procedure with respect to the service of a summons in a civil action. In addition, Physician's employment may be terminated by MeritCare immediately for "just cause." "Just Cause" shall

include one or more of the following:

a.   If Physician materially violates, breaches or fails to fulfill any of the covenants, terms, or condition of this Agreement and such breach or failure remains uncorrected after (15) days of written notice from MeritCare;

b.   If Physician engaged in any unethical conduct or medical misconduct as defined by State and National Medical Associations and such breach or failure remains uncorrected after (15) days of written notice from MeritCare; and such breach or failure remains uncorrected after (15) days of written notice from MeritCare;

c.   If Physician is suspended or excluded from participation in the Medicare Program;

d.   If MeritCare is unable to obtain malpractice insurance on behalf of the Physician, or if the cost of obtaining such insurance unreasonably exceeds the cost of obtaining such insurance for other physician employees working within the same specialty;

e.   If Physician's professional practice presents a direct threat to the safety of patients, including situations in which Physician's abuse of alcohol or drugs poses a direct threat to patient safety;

f.   If Physician fails to maintain the standard of competence deemed necessary by MeritCare and such breach or failure remains uncorrected after (15) days of written notice from MeritCare;

g.   If Physician engages in any pattern or course of conduct which adversely affects Physician's ability to provide services to MeritCare and such breach or failure remains uncorrected after (15) days of written notice from MeritCare;

h.   If Physician is deemed to have engaged in a serious violation of MeritCare policy regarding patient or employee rights after investigation, or repeatedly violates or continues to violate, after notice, any of MeritCare's polices or directives and such

breach or failure remains uncorrected after (15) days of written notice from MeritCare;

i.     If a Physician is absent from work beyond the period authorized by applicable MeritCare policies;

j.     If Physician commits fraudulent or dishonest acts which involve the practice of medicine;

k.     If Physician engages in any felonious act, or misdemeanor involving moral turpitude (as defined by state or federal law) in connection with Physician's employment;

l.     If Physician is convicted of, pleads guilty or nolo contendere to any felony, or misdemeanor involving fraudulent conduct or moral turpitude (as defined by applicable state or federal law; or

m.     If Physician fails to maintain any license or certification required to provide services under this Agreement.

211.  Relator was employed by MeritCare from April 1, 2009 through December 31, 2009 at which time Sanford Health acquired MeritCare. Relator remained in the employee of Sanford Health until April 30, 2011 when Sanford health wrongfully and pretextually terminated his employment.

212.  Relator was qualified for his position as an ophthalmologist and was board certified in that specialty.

213.  Relator was employed by Sanford Health, when he was wrongfully and pretextually terminated.

214.  Relator did not have any disciplinary actions against him.

215.  The stated reason for the termination of Relator's employment was

false and pretextual.

216.   The wrongful and pretextual termination of Relator's employment was illegal and contrary to prevailing law.

217.   The wrongful and pretextual termination of Relator's employment was the direct and proximate cause of damage to Relator.

218.   As result of the foregoing wrongful and pretextual termination of Relator's employment Relator was damaged.

219.   On or about January 1, 2010, Sanford Health acquired MeritCare and Relator became a Sanford Health employee.

220.   On or about November 15, 2010, Relator received a letter for Dr. Pitts, the Managing Physician Partner for Sanford Health congratulating him on his two-year reappointment to the medical staff.

221.   On March 15, 2011, Relator was informed that he was being terminated "for cause" effective April 30, 2011.

222.   Relator was not given ninety (90) days prior written notice of his termination pursuant to the Agreement.

223.   Relator had not breached any of the terms and conditions of the Agreement.

224.   Relator had not breached or otherwise violated the conditions set forth in the Agreement as "just cause" for immediate termination.

225.   The reason stated by Sanford Health for Relator's termination as set forth in the Sanford Health Termination Form, which is attached hereto as Exhibit B and incorporated herein by reference, states:

> Dr. Dicken is been [sic] terminated because he has failed to maintain good relation [sic] with local optometrist( [sic] referrals have completely dried up) and he has not be [sic] able grow [sic] the practice.  The eye department is on a down ward [sic] spiral and will need a complete redo.

226.   The reason given by Sanford Health was false and is a pretext.

227.   Further, the agreement provided that Sanford Health would supply the Relator with "the necessary office space and equipment, supplies and support staff generally provided to other physicians employed by MeritCare in the same specialty and practice location."  The Relator repeatedly requested equipment and support services necessary to perform his work and MeritCare and Sanford Health refused to provide everything required under the contract.  Relator and Sanford had a contract.  Sanford Health breached that contract by acting contrary to law, not providing proper notices pursuant to the terms of the contract, not supplying equipment and support services and otherwise acting contrary to the terms of the written Employment Agreement.  Defendant Sanford Health's breaches are the actual and proximate cause of damage to Relator.

228.  Relator has suffered damages in the form of loss of insurance coverage, loss of wages and benefits, loss of raises, suffered a loss of reputation and standing in his community, loss of promotions, loss of referrals, loss of

employment opportunities, loss of back pay, loss of interest on back pay, increased insurance premiums, expenses related to maintaining his certifications, expenses relate to meeting continuing education requirements, expenses related to on-going malpractice coverage, attorneys' fees and costs related to this litigation, as well as mental and emotional distress.

229.   Relator's damages resulting from the foregoing breaches by Sanford Health are in excess of $75,000.00.

**Sixth Cause of Action**

**Against Northwest Borgen and Tjelle
Interference with Contract**

230.   The allegations of the previous paragraphs are re-alleged and incorporated herein by this reference as though fully set forth.

231.   Relator had a reasonable expectation of continued employment with Sanford Health. The Defendant Doctors knew of Relator's employment agreement with Sanford Health.

232.   The Defendant Doctors used wrongful and unlawful means to "steal" the patients of the Relator and to take over their care with respect to monitoring and treating various non-surgical conditions.  The Defendant Doctors used various methods of inducing patients to come to them for treatment instead of the Relator, including but not limited to telling patients that they could do everything Relator could, despite the fact they were not licensed to practice medicine. Patients were

also told by the Defendant Doctors that the Relator would "be glad" if they made appointments with Dr. Borgen and Tjelle "because the Relator was so busy". In addition, Dr. Borgen and Tjelle's office staff answered most of the telephone calls, which came into the clinic. The defendants staff would schedule appointments with Dr. Borgen or Tjelle for patients who had called wanting to set an appointment with Dr. Dicken.

233.   Relator began whistleblowing about the suspected violations of law with respect to the Defendant Doctors' medical practice and billing procedures in August of 2008 and continuing in 2009, 2010 and a written report on March 28, 2011 and a verbal report at a meeting with Nancy Demarais, administrator and Chris Harff, hospital CEO on April 12, 2011.   Relator was wrongfully and pretextually terminated in retaliation for whistleblowing by Sanford Health on April 30, 2011. In retaliation for Relator reporting to his superiors the Defendant Doctors' suspected violations of law, the Defendant Doctors maliciously and wilfully began a campaign to ruin the Relator's practice, knowing that this would lead to his termination.   Initially they greatly decreased the number of patients they referred to the Relator for ophthalmic procedures until ultimately they virtually stopped referring any patients.   Further, Drs. Borgen and Tjelle began criticizing the Relator's surgical ability to their patients and they also communicated criticism of the Relator directly to the management of Sanford Health.   Drs. Borgen and

Tjelle also instructed their staff to direct patients who called the clinic to themselves and/or other ophthalmologists.

234. As a result of the Defendant Doctors' campaign, Relator's practice was greatly affected and patients were lost to the Defendant Doctors and the management of Sanford Health was induced to terminate the Relator's employment.

235. The reason the Defendant Doctors were able to bring in more revenue is due to their wrongful stealing of Relator's patients and their fraudulent practice and billing procedures, which produced a greater level of revenue.

236. As a direct and proximate cause the Defendant Doctors' interference with Relator's employment contract with Sanford Health, Relator suffered damages.

237. The damages to Relator due to the Defendant Doctors' interference with his employment contract include but are not limited to loss of insurance coverage, loss of wages and benefits, loss of raises, suffered a loss of reputation and standing in his community, loss of promotions, loss of referrals, loss of employment opportunities, loss of back pay, loss of interest on back pay, increased insurance premiums, expenses related to maintaining his certifications, expenses relate to meeting continuing education requirements, expenses related to on-going malpractice coverage, attorneys' fees and costs related to this litigation, as well as

mental and emotional distress.

238.   Relator's damages are in excess of $75,000.00.

## Seventh Cause of Action

### Against Northwest Borgen and Tjelle FOR
### Interference with Prospective Economic Advantage

239.   The allegations of the previous paragraphs are re-alleged and incorporated herein by this reference as though fully set forth.

240.   The Defendant Doctors used wrongful and unlawful means to steal the patients of the Relator and to take over their care with respect to monitoring and treating various non-surgical conditions.  The Defendant Doctors used various methods of inducing patients to come to them for treatment instead of the Relator, including but limited to telling patients that they could do everything Relator could, despite the fact they were not licensed to practice medicine. Patients were also told by the Defendant Doctors that the Relator would "be glad" if they made appointments with Dr. Borgen and Tjelle "because the Relator was so busy". In addition, Dr. Borgen and Tjelle's office staff answered most of the telephone calls, which came into the clinic. The defendants staff would schedule appointments with Dr. Borgen or Tjelle for patients who had called wanting to set an appointment with Dr. Dicken.

241.   Relator began whistleblowing about the suspected violations of law with respect to the Defendant Doctors' medical practice and billing procedures in

August of 2008 and continuing in 2009, 2010 and a final report on March 28, 2011. Relator was terminated by Sanford Health on April 30, 2011.  In retaliation for Relator reporting to his superiors the Defendant Doctors' suspected violations of law, the Defendant Doctors maliciously and wilfully began a campaign to ruin the Relator's practice, knowing that this would also lead to his termination. Initially they greatly decreased the number of patients they referred to the Relator for ophthalmic procedures until ultimately they virtually stopped referring any patients.  Further, Drs. Borgen and Tjelle began criticizing the Relator's surgical ability to their patients and they also communicated criticism of the Relator directly to the management of Sanford Health.  Drs. Borgen and Tjelle also instructed their staff to direct patients who called the clinic, to other ophthalmologists.

242.   These activities of Dr. Borgen and Tjelle continued from 2002 through 2008 and steadily began to erode Dr. Dickens' patient load at the Thief River Falls Clinic, while increasing Defendant's own practice, as they attempted to do more and more procedures that should have been done by Dr. Dicken.  As a result of the actions of Defendant's Northwest, Borgen and Tjelle, Dr. Dicken's income was on a downward spiral, year after year.

243.   As a result of the Defendant Doctors' campaign, Relator's practice was greatly affected and patients were lost to the Defendant Doctors and the

management of Sanford Health were induced to terminate the Relator's employment.

244.   The Defendant Doctors' actions in interfering with Relator's prospective economic advantage were the direct and proximate cause of damage to the Relator.

245.   The damages to Relator due to the Defendant Doctors' interference with his prospective economic advantage include, but are not limited to loss of insurance coverage, loss of wages and benefits, loss of raises, suffered a loss of reputation and standing in his community, loss of promotions, loss of referrals, loss of employment opportunities, loss of back pay, loss of interest on back pay, increased insurance premiums, expenses related to maintaining his certifications, expenses relate to meeting continuing education requirements, expenses related to on-going malpractice coverage, attorneys' fees and costs related to this litigation, as well as  mental and emotional distress.

246.   Relator was damaged in excess of $75,000.00

## PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as follows:

1.     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and

fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

2.     That civil penalties of $11,000.00 be imposed for each and every false and fraudulent claim that Defendants presented to the United States and/or its grantees;

3.     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

4.     That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Complaint;

5.     That the Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act;

6.     That the Court award punitive damages to be paid by the Defendant Doctors jointly and severally;

7.     That Relator be awarded compensatory damages to be paid by the Defendants for violations of 31 U.S.C. §3730(h) for his lost wages, benefits, lost raises, suffered a loss of reputation and standing in his community, lost promotions, lost referrals, and lost employment opportunities as well as severe mental and emotional distress;

8.     That Relator be awarded compensatory damages to be paid by the

Defendants for violations of Minnesota Statute § 181.932 for his lost wages, benefits, lost raises, suffered a loss of reputation and standing in his community, lost promotions, lost referrals, and lost employment opportunities as well as severe mental and emotional distress;

9.     That Relator be awarded reasonable attorneys' fees, costs and disbursements pursuant to 31 U.S.C. § 3730(d).

10.     That Relator be awarded his reasonable attorneys' fees, costs and disbursements pursuant to Minnesota Statute §181.935(a);

11.     That Relator be awarded such appropriate relief as set forth in Minnesota Statute 181.935(c);

12.     That Relator be awarded damages for the wrongful termination of his employment in breach the employment contract.

13.     That Relator be awarded damages for the Defendant Doctors' interference with his employment contract.

14.     That Relator be awarded damages for the Defendant Doctors' interference in and loss of his prospective economic advantage.

15.     That this Court award such other and further relief as it deems proper. Relator requests jury trial.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on

all claims alleged herein.


Date: April 14, 2014                          Neff Law Firm, P.A.


                                              _____
                                              Fred L. Neff, Atty. Reg. #0077355
                                              One Corporate Plaza, Ste. 390
                                              7400 Metro Boulevard
                                              Edina, MN 55439
                                              Telephone: (952) 831-6555
                                              Facsimile: (952) 831-2711
                                              **_Attorney for Relator_**